

1996 Decisions

9-18-1996

# Kneipp v. Tedder

Precedential or Non-Precedential:

Docket 95-2044

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Kneipp v. Tedder" (1996). *1996 Decisions.* Paper 77.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/77

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-2044
_____

SAMANTHA KNEIPP, an incompetent person by; RONALD A.
CUSACK, SR.; ROSANNE M. CUSACK, Individually and as
Guardians; ALEXANDER AUGUST DALMISANO, A Minor

Appellants

vs.

WESLEY TEDDER, Individually and in his Official
Capacity; JOHN DOE AND OTHERS, Individually and in
their official capacities; CITY OF PHILADELPHIA
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 95-cv-00129)
_____

Argued
June 3, 1996
Before:  BECKER and MANSMANN, Circuit Judges,
and BROTMAN, District Judge.*

(Filed September 18, 1996)
_____

Howard K. Trubman, Esquire (ARGUED)
Suite 400
21 South 12th Street
Philadelphia, PA  19107

  COUNSEL FOR APPELLANT

Michael F. Eichert, Esquire (ARGUED)
 Chief Deputy City Solicitor
Marie C. Lasota, Esquire
  Assistant City Solicitor
Office of City Solicitor
1600 Arch Street
8th Floor
Philadelphia, PA  19103-2081

  COUNSEL FOR APPELLEES TEDDER AND CITY

*       Honorable Stanley S. Brotman of the United States
District Court for the District of New Jersey, sitting by
designation.

---

OPINION OF THE COURT

---

MANSMANN, Circuit Judge.

In a civil rights complaint brought against the City of Philadelphia and certain police officers, the parents and legal guardians of Samantha Kneipp allege that late one January evening when Kneipp, in an obvious state of severe inebriation, was attempting to return on foot to her nearby apartment, the police officers stopped her and sent her on alone.

We hold that, if proven, the facts alleged will sustain a prima facie case of a violation of Kneipp's Fourteenth Amendment substantive due process right and her liberty interest in personal security under the theory that city police officers increased the risk of harm to Kneipp which ultimately resulted in the severe damages she sustained. In so holding, we adopt the "state-created danger" theory as a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983. On remand, the municipal liability claims against the City should be reexamined by the district court in light of the appropriate legal standard.

I.

The events leading to the tragedy that befell Samantha Kneipp began in the late evening of January 23, 1993. Samantha and her husband Joseph were returning on foot from a night of drinking at a tavern in Bucks County, Pennsylvania. According to Joseph, Samantha was visibly intoxicated--she smelled of urine, staggered when she walked and, at times, was unable to walk without assistance. Joseph testified that he had to carry Samantha a portion of the way home.

Shortly after midnight, now January 24, 1993, Philadelphia Police Officer Wesley Tedder stopped the Kneipps for causing a disturbance on the highway. At this point, the Kneipps were only one-third of a block from their home. Unable to stand by herself, Samantha was leaning on Officer Tedder's car. Officer Tedder questioned Samantha and Joseph separately; he stated in his deposition that he smelled alcohol on Samantha and found both of them to be intoxicated. He gave Samantha instructions to go stand somewhere, which she did not follow. Joseph told Officer Tedder that he just wanted to get his wife into their apartment.

Shortly after Officer Tedder stopped the Kneipps, three other police officers arrived separately at the scene and positioned themselves across the street from Officer Tedder. Joseph left Officer Tedder and crossed over to the other side of the street where the police cars were situated. Joseph told one of the officers that he had a babysitter watching his son and that he was supposed to be home by now. Joseph then asked the officer if he could go home, to which the officer replied, "Yeah,

sure."  When Joseph left to walk home, Samantha was leaning on the front of a police car in the presence of several police officers.  Joseph testified that he assumed that because Samantha was drunk, the police officers were going to take her either to the hospital or to the police station.  His thoughts at the time were that Samantha should not be left alone in her inebriated state and that the police officers would take care of her, so he proceeded home without her.  Officer Tedder, however, sent Samantha home alone; she never reached her apartment building.

When his wife did not return to their apartment, Joseph went out to look for her.  He saw a police car parked in a Sunoco station not far from his apartment building.  As Joseph approached the car, he discovered Officer Tedder inside, and asked him if he had locked up Samantha or had taken her to the hospital.  According to Joseph, Officer Tedder told him "to get out of here before he locked [him] up."  Because of a previous experience with the Philadelphia police, Joseph took Officer Tedder's remark seriously and left.  Joseph decided to continue looking for Samantha, and as he proceeded in the direction of a neighborhood convenience store, he thought he saw someone resembling Samantha, dressed in similar clothing, getting into an orange car.  Because of Samantha's previous infidelity, Joseph thought that if it were Samantha, she was cheating on him again and would return when she was done.  Joseph was never certain, however, that the woman he saw entering the car was Samantha. Joseph decided to forego his search and returned home.

At approximately 1:51 a.m., Officer Francis Healy responded to a radio call reporting that an individual was found unconscious at the bottom of an embankment next to a parking lot at the shopping plaza across the street from the Kneipps' home. The unconscious individual was Samantha Kneipp.  Joseph was awakened around 4:00 a.m. by Officer Healy, who informed him that Samantha had fallen and was in the hospital.

As a result of her exposure to the cold, Samantha suffered hypothermia, which caused a condition known as anoxia. Consequently, the anoxia resulted in permanent brain damage impairing many basic body functions.

Samantha's legal guardians instituted this civil rights action under 42 U.S.C. § 1983 against the City of Philadelphia and several police officers, alleging that the police officers were aware of Samantha's intoxication and "the potential for her to suffer harm because of her profoundly impaired faculties."  By voluntarily assuming responsibility for her protection when they told Joseph he could leave, it was alleged that the officers affirmatively created a danger and increased the risk that Samantha might be injured when they later abandoned her.  It is further alleged that the police conduct made Samantha "more vulnerable" [by] . . . "interfer[ing] with the efforts of Joseph [ ] to assist his wife to safety."  Because the police officers acted with "deliberate or reckless indifference, callous disregard, or in such an arbitrary or abusive manner so as to shock the conscience," the legal guardians maintained that Samantha was deprived of her right to substantive due process and her liberty interest in personal security in violation of the

Fourteenth Amendment of the United States Constitution.

In addition, the legal guardians contended that the City of Philadelphia, by acquiescing in the longstanding policy, custom, or practice of not posting "activity credits" for taking intoxicated pedestrians into custody, and by failing to adequately train its police officers in the proper care of intoxicated persons, acted with "deliberate or reckless indifference, callous disregard, or in an arbitrary and abusive manner so as to shock the conscience," thereby also violating Samantha's right to substantive due process and her liberty interest in personal security.

In granting the defendants' motion for summary judgment, the district court found that the legal guardians had failed to prove a constitutional violation under either the "special relationship" test or the state-created danger theory. The court also denied a motion for reconsideration.

The legal guardians filed a timely notice of appeal from the order of the district court. We have jurisdiction pursuant to 28 U.S.C. § 1291; we exercise de novo review of the district court's grant of summary judgment. Ideal Dairy Farms, supra; Antol v. Perry, 82 F.3d 1291, 1294 (3d Cir. 1996).

## II.

We begin our analysis with a discussion of the requirements for establishing a constitutional claim under 42 U.S.C. § 1983. The pertinent language of section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws. Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.), cert. denied, 116 S. Ct. 165 (1995) (citation omitted). In order to establish a section 1983 claim, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." Mark, 51 F.3d at 1141 (quoting Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)). Here, Samantha Kneipp's legal guardians have alleged that the City and police officers violated Samantha's right to substantive due process guaranteed by the Fourteenth Amendment.

In DeShaney v. Winnebago Co. Dep't of Social Serv., 489

U.S. 189, 197 (1989), the Supreme Court considered whether the due process clause of the Fourteenth Amendment imposed upon the state an affirmative duty to protect an individual against private violence where a special relationship exists between the state and the private individual.  The Court found that the special relationship which would impose affirmative duties of care and protection on the state existed only in certain limited circumstances, such as when the state takes a person into its custody and holds him there against his will.  Id. at 199-201.  The Court explained:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id. at 200 (footnote omitted).  Applying this principle to the facts in DeShaney, the Court did not find a due process violation as the harms suffered by the child occurred while he was in the custody of his father, not in the state's custody.  Id. at 201.

In the case before us, we agree with the district court that the special relationship required by DeShaney did not exist between Samantha and the police officers.  We disagree, however, with the holding of the district court insofar as it adds a special relationship requirement to the state-created danger theory.  In DeShaney, the Supreme Court left open the possibility that a constitutional violation might have occurred despite the absence of a special relationship when it stated:  "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  Id. at 201.  Several of our sister courts of appeals have cited this comment by the Court as support for utilizing a state-created danger theory to establish a constitutional claim under 42 U.S.C. § 1983.  See Uhlrig v. Harder, 64 F.3d 567, 572 n. 7 (10th Cir. 1995), cert. denied, 116 S.Ct. 924 (1996); Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir.), cert. denied, 510 U.S. 947 (1993); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990).  Moreover, two other courts of appeals, in decisions predating DeShaney, recognized the state-created danger theory as a basis for establishing a constitutional claim under section 1983.  SeeCornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), cert. denied, 494 U.S. 1066 (1990); Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), cert. denied, 498 U.S. 938 (1990).

In previous cases, we have considered the possible viability of the state-created danger theory as a mechanism for establishing a constitutional claim pursuant to 42 U.S.C. § 1983.

Mark, 51 F.3d at 1152 (citing D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1373 (3d Cir. 1992) (in banc), cert. denied, 506 U.S. 1079 (1993)); see also Brown v. Grabowski, 922 F.2d 1097, 1114-16 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991).  Until now, we have not, however, been presented with the appropriate factual background to support a finding that state actors created a danger which deprived an individual of her Fourteenth Amendment right to substantive due process.  Samantha Kneipp's case presents the right set of facts which, if believed, would trigger the application of the state-created danger theory.  We turn first to our previous decisions in this area.

In the 1990 case of Brown v. Grabowski, supra, Deborah Evans had been abducted and murdered by her former live-in boyfriend, Clifton McKenzie.  Prior to the abduction, McKenzie had held Evans hostage for three days, during which he repeatedly threatened and sexually assaulted her.  Although Evans and her family reported this information to the local police, criminal charges were never filed.  Shortly thereafter, Evans was abducted and imprisoned in the trunk of her car where she froze to death.  The personal representative of Evans' estate filed a civil rights complaint against the borough and employees of the police department alleging, inter alia, that Detective Grabowski, in failing to file criminal charges against McKenzie and in failing to inform Evans of her right as a victim of domestic violence to obtain a restraining order against McKenzie, violated her constitutional rights to due process and of access to the civil and criminal courts.

The plaintiff in Brown relied upon Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), and Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), in support of her argument that the state-created danger theory was a viable basis for imposing constitutional liability under section 1983.  In Wood, a police officer stranded the female passenger of a drunk driver along the side of the road in a high-crime area at 2:30 a.m.  While undertaking the five mile walk to her home, the passenger accepted a ride from a stranger who took her to a secluded area and raped her.  The Court of Appeals for the Ninth Circuit held that the plaintiff had raised a triable issue of fact as to whether the police officer "`affirmatively placed [her] in a position of danger.'"  879 F.2d at 589-90 (citation omitted).  The court further held that the plaintiff was distinguishable from the general public and, therefore, the police had a duty to offer her some degree of peace and safety.  Id. at 590 (citing White v. Rockford, 592 F.2d 381, 384 & n.6 (7th Cir. 1979)).

The Court of Appeals for the Eleventh Circuit in Cornelius validated the use of the "special danger" theory as a basis for establishing a constitutional violation under 42 U.S.C. § 1983.  In that case, Mrs. Cornelius was abducted at knife-point by two prison inmates assigned to a community work squad at the town hall where she worked.  Mrs. Cornelius was held hostage and terrorized for three days before being abandoned in another state.  She subsequently commenced a civil rights action against various prison and town officials, alleging they owed her a duty to assign only properly classified prison inmates, i.e.,

nonviolent-offenders, to the community work squads and to provide adequately skilled and trained officials to supervise the prison work squads. 880 F.2d at 352. In concluding that a triable issue of fact existed precluding summary judgment, the court found that the defendants affirmatively created a dangerous situation by establishing the work squad and assigning inmates to work around town hall. Id. at 356. Moreover, because of her position as town clerk, Mrs. Cornelius was regularly exposed to prison work squads, thereby increasing her vulnerability to harm. Id. These two factors taken together "effectively operated to place [Mrs. Cornelius] in a position of danger distinct from that facing the public at large" and were sufficient to impose a duty under section 1983. Id. at 357.

The court of appeals in Cornelius also imposed a nexus element to establish a triable issue as to special danger. Citing Martinez v. California, 444 U.S. 277 (1980), the court held that there must be a sufficiently close nexus between the defendant's conduct and the plaintiff's alleged due process violation under the Fourteenth Amendment to establish a constitutional claim based on the special danger theory. 880 F.2d at 353 and 358. The court of appeals found the employees at the town hall, including Mrs. Cornelius, "were well within the identifiable radius of harm known to defendants," and thus concluded that these facts created a triable issue as to special danger. Id. at 359.

We found Wood and Cornelius to be distinguishable from the facts in Brown -- in the former cases, the state defendants affirmatively acted to create the danger to the victims; the plaintiff in Brown, however, failed to offer any evidence that the police officers acted to create or to exacerbate the danger that the former boyfriend posed to the victim. 922 F.2d at 1116. The plaintiff demonstrated only that Detective Grabowski failed to advise the victim of her right to seek a protective order. Id. Thus, we concluded in Brown that the plaintiff had failed to establish a cognizable constitutional claim under section 1983.

In 1992, sitting in banc, we considered the state-created danger theory in D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992). There two female students at a public high school alleged that they were physically, verbally and sexually molested by male students in a unisex bathroom and in a darkroom, which were parts of the graphic arts classroom. The students' parents brought a civil rights action against the school district and several school officials and employees, alleging that the defendants created the danger that resulted in a violation of the plaintiffs' constitutional rights. In support of this claim, plaintiffs argued that the school defendants "`created a climate which facilitated sexual and physical abuse of students'" and, having thrust plaintiffs into this situation, "were obligated to protect them from violations of their personal bodily integrity by other students who were also under defendants' control." Id. at 1373.

In D.R., we recognized that the state-created danger theory had been utilized by several courts of appeals to find a constitutional violation under section 1983 in non-custodial

settings.  Id.  We read the post-DeShaney decisions to frame the inquiry as "whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it."  Id. (citation omitted).  We continued that "[l]iability under the state created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger."  Id. at 1374.  We quoted the following comment from the Court of Appeals for the Seventh Circuit:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is.  If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

Id. (quoting Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982)).

We concluded in D.R. that the facts presented did not show that the defendants created the students' danger, increased their risk of harm, or made them more vulnerable to the assaults.  Id.  Moreover, we found the state-created danger line of cases to be factually distinguishable in a critical respect:  in the cases where the courts imposed a constitutional duty based on a state-created danger, the state had affirmatively acted to create the danger.  Id.  In D.R., we found that the harm to the students resulted solely from the acts of private individuals, and not from the type of intermingling between state conduct and private violence that imposed liability in Wood and Cornelius.  Id. at 1375.  The acts or omissions of the school defendants in D.R., we concluded, did not rise to the level of affirmative action required to impose liability under the state-created danger theory.

In the 1994 case of Fagan v. City of Vineland, 22 F.3d 1296 (3d Cir. 1994) (in banc) (Fagan II), the plaintiffs claimed their constitutional rights to substantive due process were violated when police officers recklessly conducted a high speed pursuit in violation of the Attorney General's guidelines.  The plaintiffs also alleged that the municipal defendant was liable because it followed a policy of not properly training and supervising police officers in conducting high-speed pursuits, and because it followed a policy of not enforcing the pursuit guidelines.  The sole issue before us was the appropriate standard by which to judge police conduct in pursuit cases alleging a violation of substantive due process.  Id. at 1299.  We held that the appropriate standard to be applied in police pursuit cases involving an alleged violation of substantive due process is the "shocks the conscience" test.  Id. at 1303.

In Fagan II, we declined to consider the applicability of the DeShaney line of cases which imposed a constitutional duty

in limited situations, i.e., special relationship or custody cases, to police pursuit cases, as this issue was not raised by the parties or addressed by the district court.  Id. at 1308 n.9.  Moreover, the plaintiffs in Fagan II did not advance the state-created danger theory as a basis for establishing a constitutional violation.  Thus, neither the district court nor our court had the opportunity in Fagan II to review the viability of the state-created danger theory.  We believe that the Fagan IIshocks the conscience standard is limited to police pursuit cases, and accordingly, we are not bound to follow that standard in the case before us.

In the 1995 case of Mark v. Borough of Hatboro, supra, we suggested a test for applying the state-created danger theory.  We found that cases predicating constitutional liability on a state-created danger theory have four common elements:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

51 F.3d at 1152.  We further noted that "[t]he cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury."  Id. at 1153.  Those courts which have recognized the state-created danger theory have employed a deliberate indifference standard.  Id. at 1152 (quoting Johnson v. Dallas Independent School Dist., 38 F.3d 198, 201 (5th Cir. 1944), cert. denied, 115 S. Ct. 1361 (1995); Wood, 879 F.2d at 588; Cornelius, 880 F.2d at 350).

We again declined to adopt the state-created danger theory in Mark because its facts were dissimilar to the courts of appeals cases which upheld its use.  Id. at 1152.  The alleged constitutional violation in Mark arose from the borough's "failure to follow adequate policies to ensure that applicants to the fire department were screened sufficiently for tendencies towards arson."  Id. at 1140.  We concluded that when the alleged violation involved a policy directed at the public in general, such as the one at issue in Mark, the basis for the state-created danger theory was obviated insofar as the defendant lacked specific knowledge of the plaintiffs' condition, and a relationship between the defendants and plaintiffs did not exist.  Id. at 1153.

We turn now to the unique facts presented in the case before us.

### III.

We begin by applying the four common elements we set forth in Marks for the state-created danger theory.  First, the

injuries to Samantha were foreseeable -- Dr. Saferstein stated in his report that at a blood alcohol level of .25%, Samantha's muscular coordination was seriously impaired. Joseph's testimony as to how he had to help his wife walk, even carry her at times, also tends to show that Samantha's ability to walk was impaired. A reasonable trier of fact could conclude that in Samantha's state of intoxication, she would be more likely to fall and injure herself if left unescorted than someone who was not inebriated. Based on the facts and inferences most favorable to the legal guardians, we hold that a reasonable jury could find that the harm likely to befall Samantha if separated from Joseph while in a highly intoxicated state in cold weather was indeed foreseeable.

Second, we find the plaintiffs have adduced sufficient evidence to raise a material issue as to whether Officer Tedder acted in willful disregard for Samantha's safety. The plaintiffs presented evidence regarding Samantha's level of intoxication and impairment; by Officer Tedder's own testimony, he admitted that he knew Samantha was drunk. Moreover, Tedder's statement that he sent Samantha and Joseph home together is contradicted by the testimony of Joseph, Officer Healy and Tina Leone.

We also believe the legal guardians have proved the third element -- a relationship between the state and the person injured (here Officer Tedder and Samantha and Joseph Kneipp) during which the state places the victim in danger of a foreseeable injury. Mark, 51 F.3d at 1153. Here it is alleged that Officer Tedder, exercising his powers as a police officer, placed Samantha in danger of foreseeable injury when he sent her home unescorted in a visibly intoxicated state in cold weather. A reasonable jury could find that Officer Tedder exerted sufficient control over Samantha to meet the relationship requirement.

Finally, there is sufficient evidence in the summary judgment record to show that Officer Tedder and the other police officers used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened. The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm. It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife back to their apartment where she would have been safe. A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased. Thus, we believe that a reasonable jury could find that the fourth and final requirement of Mark was satisfied here.

We find additional support for our position in the courts of appeals' decisions previously cited. See Reed v. Gardner, 986 F.2d at 1127 (police officer who removed a sober driver and left behind a passenger whom he knew to be drunk with the keys to the car was subject to liability under 42 U.S.C. §

1983); Freeman v. Ferguson, 911 F.2d at 54 (police chief, by interfering with police officers' enforcement of restraining order, created the danger which resulted in the victims' deaths and thus deprived victims of their constitutional rights); White v. Rockford, 529 F.2d at 385 (police officers who arrested uncle for drag racing and left minor children alone in abandoned car on the side of a busy, limited-access highway in cold weather had deprived children of their constitutional rights to personal security where the abandonment resulted in physical and emotional injury to the children).

      In contrast to the above cited authority stands the en banc decision of the United States Court of Appeals for the Eighth Circuit in Gregory v. City of Rogers, Arkansas, 974 F.2d 1006 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993). In that case, the plaintiffs brought a civil rights action against the municipality and one of its police officers on the basis that defendants had a duty to provide for the safety of the passengers of a drinking group after the police arrested their designated driver on an outstanding warrant. After detaining the designated driver along the road for several minutes, the police allowed the designated driver to drive the car to the police station. The intoxicated passengers remained in the car, which was parked in front of the police station, while the designated driver cleared up the outstanding warrant inside the station with the police. After waiting approximately thirty minutes, one of the intoxicated passengers, the owner of the car, drove the car away and subsequently was involved in a one-car accident, killing himself and seriously injuring his passenger. Plaintiffs contended that the police officer actively placed the passengers in danger by permitting them to stay in the car unattended while waiting for the designated driver at the police station "`in spite of their obviously intoxicated condition.'" Id. at 1009-10.

      In Gregory, the plaintiffs' argument turned on whether the police officer knew or should have known the passengers were intoxicated. The court of appeals found that the plaintiffs failed to submit sufficient evidence which would lead a reasonable trier of fact to conclude that the police officer knew or should have known that the passengers were intoxicated and unfit to drive, and thus, upheld the district court's grant of summary judgment. The court of appeals, however, did not end its analysis there. It went on to say that even if the police officers knew the passengers were intoxicated, a reasonable jury could not find that the police officer affirmatively placed the passengers in danger by leaving them unattended in the car at the station. Id. at 1011. The court explained that it was the designated driver who placed the passengers in danger by leaving the keys in the car when he went into the police station. Id. at 1012. To impose a duty on the police to take affirmative action to protect the passengers, the court held, would circumvent the general rule that plaintiffs do not have a constitutional right to be protected by the police against harm inflicted by third persons. Id. (citing Wells v. Walker, 852 F.2d 368, 370 (8th Cir. 1988), cert. denied, 489 U.S. 1012 (1989); DeShaney, 489

U.S. at 195-96).

Gregory, however, is distinguishable from this case in two respects. First the court of appeals in Gregory found that the police officer did not know that the passengers were intoxicated -- neither the testimony of the witnesses, nor the behavior of the two passengers observed during the traffic stop on the roadway indicated they were intoxicated. In contrast here, Officer Tedder admitted that he knew Samantha was drunk at the time he was questioning her, and Samantha was observed staggering, walking and standing with difficulty, requiring that she lean on parked cars or be carried by her husband.

The second distinction is who created the danger -- in Gregory, the court found that the third party created the danger by leaving the keys in the car; in the case before us, the police officers intervened to cut off Samantha's private source of protection by giving Joseph permission to go home alone, thereby increasing the danger that Samantha would suffer harm in her visibly intoxicated state when they abandoned her. The affirmative acts of the police officers here created a dangerous situation, requiring that they take additional measures to ensure Samantha's safety. That they failed to take the appropriate measures, knowing that Samantha was severely intoxicated, shows that the police officers acted with reckless disregard for her safety. On the other hand, the conduct of the police officer in Gregory did not rise to a level of recklessness. He did not know the passengers were drunk; nor did he take any affirmative action to create the dangerous situation -- leaving the keys in the car. Put another way, the passengers in Gregory were never abandoned; all they had to do was remain in the safety of the car and await the return of their driver. Samantha, however, was isolated from her husband and then abandoned by the police. Clearly then, because of these two important distinctions, Gregory is not dispositive of the issue before us.

At oral argument, we requested counsel for both sides to submit a letter brief under Fed. R. App. P. 28(j) on the issue of whether the Philadelphia police officers have a duty to arrest an intoxicated person as a basis for imposing liability for a constitutional tort under section 1983. We are convinced, after reviewing the pertinent caselaw, that no such duty exists in Pennsylvania. Even so, the failure to arrest Samantha would not give rise to a constitutional claim, as liability under section 1983 can be predicated only on violations of "federal statutory or constitutional rights under color of state law." D.R., 972 F.2d at 1375 (citations omitted). The illegal conduct under the state law cannot add to or subtract from the "constitutional validity `[of a state's actions].'" Id.(citations omitted).

Under the particular circumstances of this case, we hold that the state-created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983. When viewed in the light most favorable to the legal guardians, the evidence submitted was sufficient to raise a triable issue of fact as to whether the police officers affirmatively placed Samantha in a position of danger. The district court erred,

therefore, in granting summary judgment for the defendant police officers based on its finding that a constitutional violation had not occurred.

IV.

The plaintiffs also argue that liability should be imposed under section 1983 against the City of Philadelphia for constitutional violations as a result of the City's acquiescence in the longstanding policy, custom or practice of not granting "activity credits" for taking intoxicated individuals into custody, and its failure to adequately train its police officers in the proper care of intoxicated persons. By so doing, the plaintiffs contend, the City acted with "deliberate or reckless indifference, callous disregard, or in an arbitrary and abusive manner so as to shock the conscience." Consequently, Samantha's right to substantive due process and her liberty interest in personal security guaranteed by the Fourteenth Amendment were allegedly violated.

We do not believe the district court adequately considered the appropriate legal standard in granting the City's motion for summary judgment. Although we feel compelled to set forth the appropriate legal standard, we decline to rule on whether it was met here, leaving that determination to the district court in the first instance.

The Supreme Court enunciated the rule for imposing liability against a municipality under section 1983 in Monell v. New York City Dept. of Social Serv., 436 U.S. 658 (1978). The Court held in Monell that:

> . . . a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Id. at 694. Accordingly, the Supreme Court expressly rejected the imposition of section 1983 liability against a municipality on a respondeat superior theory. Id. at 691.

In City of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court was asked to decide whether liability can ever be imposed against a municipality under section 1983 for constitutional violations as a result of failing to train its police officers. Mrs. Harris had been arrested and taken to the police station for processing where she "slumped to the floor" twice and spoke incoherently. Medical assistance was never sought for her. Following her release from custody, Mrs. Harris was taken to a hospital by her family, where she was diagnosed as suffering from several emotional injuries. In concluding that section 1983 liability may attach to a municipality if it had a policy or custom of failing to train its employees and that failure caused the underlying constitutional violation, the

Court rejected the City of Canton's argument that only unconstitutional policies are actionable under the civil rights statute.  Id. at 387.  As to the degree of fault required to impose liability for the municipality's inaction, the Court articulated the following rule:  "the inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact."  Id. at 388 (footnote omitted).  The Court further explained:

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983 . . . .  Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality -- a "policy" as defined by our prior cases -- can a city be liable for such a failure under § 1983.

Id. at 389.  In addition to proving deliberate indifference, the Court held that the plaintiffs must show that the "deficiency in training actually caused the police officers' indifference to [the individual's] medical needs."  Id. at 391.

Recently, we had the opportunity to examine the holdings of Monell and its progeny in Beck v. City of Pittsburgh, ___ F.3d ___, No. 95-3328, 1996 WL 406776 (3d Cir. July 22, 1996).  In Beck, we were asked to decide whether sufficient evidence had been presented for a jury to infer that a municipality had adopted a custom of permitting its police officers to use excessive force in the performance of their duties.  Citing Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), we noted that the Supreme Court recognized a "two-path track to municipal liability under § 1983," either through government policy or custom.  Beck, 1986 WL 406776, at *6.  We had previously set forth the parameters of a government policy or custom for section 1983 liability:

> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.  A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law.

Beck, id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).  Moreover, a prerequisite to establishing liability in either situation is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom.  Id.  See also Jett v. Dallas Independent School Dist., 491 U.S. 701 (1989); Bielevicz

v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).

In order to ascertain who is a policymaker, "a court must determine which official has final, unreviewable discretion to make a decision or take action." Andrews, 895 F.2d at 1481. We further held in Bielevicz that:

> Under § 1983, only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality. This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence. Practices "`so permanent and well settled' as to have `the force of law' [are] ascribable to municipal decisionmakers."

915 F.2d at 850 (citations omitted).

Proof only of the existence of an unlawful policy or custom is not sufficient, however, to impose municipal liability under section 1983. Id. A plaintiff must also establish that the government policy or custom was the proximate cause of the injuries sustained. Id. (citation omitted). "To establish the necessary causation, a plaintiff must demonstrate a `plausible nexus' or `affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Id. (citation omitted). To the extent that the "causal link" is not too attenuated, the jury must decide whether the government policy or custom proximately caused the constitutional violation. Id.

Here, the district court dismissed the municipal liability claims against the City of Philadelphia on the basis that the plaintiffs failed to establish an underlying constitutional violation pursuant to section 1983. It does not appear that, in so ruling, the district court considered the substantive elements of the municipal liability claims -- whether (1) the City of Philadelphia's training program for handling intoxicated persons was adequate; (2) if the training program was inadequate, the City was deliberately indifferent to the deficiency; and, (3) the deficiency in the training actually caused the police officers' indifference to Samantha's intoxication and need for assistance. The precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual police officers, as the City's liability for a substantive due process violation does not depend upon the liability of any police officer. Fagan v. City of Vineland, 22 F.3d 1283, 1293-94 (3d Cir. 1994) (Fagan I) (citing Simmons v. City of Philadelphia, 947 F.2d 1042, 1063 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992)). Accordingly, on remand, the district court must evaluate the municipal liability claims in light of the standards set forth above, notwithstanding the outcome as to the claims against the individual police officers.

                                    V.
        In conclusion, we find that the evidence presented,
when viewed in the light most favorable to the legal guardians,
together with all reasonable inferences on their behalf, could
support a jury's verdict in their favor as to the constitutional
violations alleged against the individual police officers.  We
will, therefore, reverse the order of the district court granting
summary judgment for the defendants and remand for trial on this
issue, and for further consideration of the municipal liability
claims against the City of Philadelphia in light of our opinion.
_____