

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-2007

# Ye v. USA

Precedential or Non-Precedential: Precedential

Docket No. 06-1034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Ye v. USA" (2007). *2007 Decisions.* Paper 1150.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1150

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-1034

ZI Z. YE;
YU ZHEN CAO, H/W

v.

UNITED STATES OF AMERICA;
U.S. DEPARTMENT OF JUSTICE;
DISTRICT HEALTH CENTER NO. 10;
CITY HOUSE CLINIC GROUP;
IKJIN KIM, M.D.


Ikjin Kim, M.D.,

Appellant

—————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 04-cv-00951
District Judge: The Honorable James T. Giles

—————————————

Argued on February 13, 2007

Before: SMITH and FISHER, *Circuit Judges*,
and DIAMOND, *District Judge*[*]

(Filed April 30, 2007)

Jane Lovitch Istvan (argued)
City of Philadelphia Law Department
One Parkway, 17th Floor
1515 Arch Street
Philadelphia, PA 19102-1595
                    *Counsel for Appellants*

Harold I. Goodman, Esquire (argued)
Gerald A. McHugh Jr., Esquire
Stephen E. Raynes, Esquire
Dan Bencivenga, Esquire
Raynes McCarty
1845 Walnut Street, 20th Floor
Philadelphia, PA  19103
                    *Counsel for Appellees*

-----

OPINION OF THE COURT

-----

[*]The Honorable Gustave Diamond, Senior District Judge
for the Western District of Pennsylvania, sitting by designation.

2

SMITH, *Circuit Judge*.

The Supreme Court held in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), that, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id*. at 200. The crux of the case before us is whether a mere assurance can be an affirmative act–a "restraint of personal liberty" similar to incarceration or institutionalization. *Id*. We hold that it cannot. Therefore, the plaintiff cannot proceed under the 'state-created danger' theory of liability derived from the Supreme Court's decision in *DeShaney*, and we will reverse the District Court's denial of summary judgment. To do otherwise would take the state-created danger doctrine beyond its precedential and constitutional origins.

## I.    Background

The facts of this case present a tragic story. Zi Z. Ye visited Dr. Ikjin Kim six times, from February 6, 2001 to March 5, 2002, at Philadelphia's District Health Care Center No. 10. Dr. Kim diagnosed Ye with hypertension, coronary artery disease, and angina. He prescribed a combination of sublingual

nitroglycerine, Procardia, and Lipitor. Ye and his son, Ken Ye, visited Dr. Kim's office on March 5, 2002. Ye, through his son, complained of shortness of breath, coughing, and discomfort in his upper body area. Ken Ye later testified that Dr. Kim told Ye that "there is nothing to worry about and that he is fine." Dr. Kim gave Ye a prescription for cough medication and told him to return in three months. Ye had visited his prior physician, Dr. Bao-Kuen Tuan on February 21, 2002.

Ken Ye visited his father at home later that day and found him unconscious. Ye was taken to Frankfort Hospital in an ambulance. Doctors at the hospital determined that Ye was suffering from congestive heart failure and had experienced a myocardial infarction. Ye received emergency bypass surgery. He nevertheless suffered respiratory failure and polyneuropathy, a degenerative nerve condition. Ye was hospitalized for a month and then transferred to a skilled nursing care center. He has since been hospitalized for acute care several times and remains on a ventilator.

Ken Ye testified that his family did not seek emergency medical assistance for Ye after leaving Dr. Kim's office because they "rel[ied] upon Dr. Kim's assurances to us that there was nothing to worry about and that my father was fine." Ken Ye also stated that, "[i]f on March 5, 2002, Dr. Kim had not assured us that my father was fine and that there was nothing wrong, I would have immediately taken my father to the emergency room."

4

Both experts presented by Ye described Dr. Kim's conduct as "a professional outrage," and "unconscionable." They agreed that Dr. Kim should have obtained complete cardiac workups in light of Ye's risk factors and prior history of coronary artery disease. They also testified that Dr. Kim should have immediately hospitalized Ye for emergency medical care upon observing bilateral pitting edema, or swelling. They further concurred that Ye's later complications would have been avoided by immediate emergency medical care.

Ye filed a variety of claims against Dr. Kim and his employers (including the United States of America), including a claim under 42 U.S.C. § 1983, in the Eastern District of Pennsylvania on March 3, 2004. Ye and the United States of America subsequently stipulated to the dismissal of the United States and the U.S. Department of Justice as parties. Dr. Kim and the remaining defendants filed for summary judgment on October 21, 2005. During summary judgment proceedings, Ye abandoned all claims except his state-created danger claim under § 1983. Dr. Kim argued that he had committed no constitutional tort and raised the affirmative defense of qualified immunity, as he was acting in his capacity as a doctor at District Health Care Center No. 10. The District Court granted summary judgment for Dr. Kim's remaining employers due to a lack of causation. However, the District Court denied Dr. Kim's motion, holding that a reasonable jury could conclude that the elements of a state-created danger were met and that qualified immunity was not available.

We have jurisdiction over this appeal of an interlocutory order as a "denial of qualified immunity that turns on an issue of law–rather than a factual dispute–is appealable as a collateral order under 28 U.S.C. § 1291." *Doe v. Groody*, 362 F.3d 232, 237 (3d Cir. 2004). The District Court had jurisdiction over the claim made pursuant to 42 U.S.C. § 1983 under 28 U.S.C. § 1331. We review the grant or denial of summary judgment de novo. *See Union Pacific R.R. v. Greentree Trans. Trucking Co.*, 293 F.3d 120 (3d Cir. 2002). In considering a motion for summary judgment, the court must draw all reasonable inferences in the manner most favorable to the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Discussion

There is no affirmative right to governmental aid or protection under the Due Process Clause of the Fourteenth Amendment. *DeShaney*, 489 U.S. at 196. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. Nothing in the language of the Due Process Clause itself requires the State to protect its citizens' life, liberty, or property from private harms. *See DeShaney*, 489 U.S. 189 at 195. The Due Process Clause prevents the Government from abusing its power or using it as an instrument of oppression. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). The Supreme Court has long recognized that the Constitution generally confers no affirmative right to governmental aid, "even where such aid may be necessary to

6

secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. 189 at 196; *see, e.g.*, *Harris v. McRae*, 448 U.S. 297, 317-318 (1980) (holding that the State has no obligation to fund abortions or other medical services); *Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (holding that the state has no obligation to provide adequate housing). The Constitution protects people from the government, not from each other or from themselves.

There are, however, two exceptions to this rule: the "special relationship" exception[1] and the "state-created danger" exception. Ye argues that Dr. Kim is liable for his mistaken assurances under the state-created danger theory of liability.

The state-created danger exception originates from the *DeShaney* Court's statement that "while the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render

---

[1]This Court "has read *DeShaney* primarily as setting out a test of physical custody" for purposes of determining whether there is a "special relationship" between the state and the plaintiff. *D.R. v. Middlebucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1370 (3d Cir. 1992) (en banc) (holding that no special relationship exists between state and school children despite compulsory attendance laws). Because Ye neither pled nor adduced proof of a "special relationship," that exception is not at issue here.

him any more vulnerable to them." *DeShaney*, 489 U.S. at 201. Many courts have explained the state-created danger exception by echoing Judge Posner's pre-*DeShaney* comments in *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982). Judge Posner described the Constitution as "a charter of negative liberties," which "tells the state to let people alone," and does not prescribe affirmative duties "to provide services, even so elementary a service as maintaining law and order." *Id*. at 618. However, even with this view, he conceded that a different result obtains where the state crosses the line from inaction to action:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Id*.

The Third Circuit first allowed a claim under the "state-created danger" theory of liability in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). Quoting *DeShaney*, the *Kneipp* Court concluded that when the harm incurred is a direct result of state action, liability can attach under § 1983. We have refined the *Kneipp* test in subsequent cases. *See Rivas v. City of Passaic*,

365 F.3d 181, 202-03 (3d Cir. 2004) (Ambro, J. concurring) (noting the changes and stating that "[i]n light of these substantial modifications to the *Kneipp* test, *Kneipp* as shorthand is a misnomer"). Notably, the test no longer requires that a crime be committed by a third-party. As Judge Ambro noted in his concurrence in *Rivas*: "The fourth element's reference to a 'third party's crime' arises from the doctrine's origin as an exception to the general rule that the state does not have a general affirmative obligation to protect its citizens from the violent acts of private individuals. The courts, however, have not limited the doctrine to cases where third parties caused the harm." *Id.* at 202 (internal quotation omitted); s*ee also Estate of Smith v. Marasco (Smith I)*, 318 F.3d 497 (3d Cir. 2003).

This Court considered the necessary elements of a state-created danger in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006). The *Bright* panel considered *Kneipp* and its progeny and clarified the four part state-created danger test. It instructed that the four elements are:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a

member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id*. at 281 (internal citations and quotation marks omitted).  The majority noted that the addition of the word "affirmatively" to the fourth element was not an innovation–but merely a recognition that both *DeShaney* and this Court's precedents explicitly required an affirmative act, rather than inaction.  *Id*. at 282 (citing *D.R. v. Middlebucks Area Vocational Tech. Sch*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc) ("Liability under the state-created danger theory is predicated upon the state's affirmative acts which work to the plaintiff's detriment in terms of exposure to danger."); *Brown v. Grabowski*, 922 F.2d 1097, 1100-01 (3d Cir. 1990) (noting that *DeShaney* holds "that a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim").

The first question in determining whether Dr. Kim should receive the protection of qualified immunity is whether he violated Ye's constitutional rights—in this case, whether his

10

actions constituted a violation of the substantive component of the Due Process Clause via the state-created danger exception. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Dr. Kim concedes that the first three elements of a state-created danger claim are satisfied.[2] The *Bright* panel noted that the fourth

___

[2]This concession may have been precipitous with regard to the "shocks the conscious" element of the test. When a state actor is in a high-pressure situation in which rapid decision-making is required, such as a high-speed car chase, the required mens rea will typically be intent-to-harm. *Estate of Smith v. Marasco (Smith II)*, 430 F.3d 140, 153 (3d Cir. 2005). However, where a state actor has the time to act deliberately and is not under pressure to make split-second decisions, gross negligence may be sufficient. *See Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999).

This Court gave ample consideration to the contours of the "shocks the conscience" standard in *Rivas v. City of Passaic*. 365 F.3d at 196. The facts of *Rivas* are discussed *infra*. The *Rivas* Court held that emergency medical technicians had to act "with some urgency," and therefore "the Rivas family can only meet the second element of the *Kneipp* test by presenting evidence that Garcia's and Rodriguez's conduct shocks the conscience by consciously disregarding a substantial risk that Mr. Rivas would be seriously harmed by their actions." *Id*. Put simply, the Court required gross recklessness.

The extended discussion in *Rivas* does not dictate the necessary mens rea in this case, but it does inform us that the required culpability must be somewhere within the bounds of

11

element can be broken down into its parts and analyzed accordingly. *Bright*, 443 F.3d at 281 n.5; s*ee also* Laura Oren, *Safari into the Snake Pit: The State Created Danger Doctrine*, 13 WM. & MARY BILL RTS. J. 1165, 1187 (2005). The three necessary conditions to satisfy the fourth element of a state-created danger claim are that: (1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. *Bright*, 443 F.3d at 281-82.

## 1. Did a state actor exercise his or her authority?

We have never squarely considered the meaning of the term "authority" within the context of the state-created danger doctrine. Nevertheless, Dr. Kim urges us to give definition to this section of the fourth *Bright* element in an effort to bar Ye's

---

gross negligence, at a minimum, and gross recklessness, at a maximum. Though there are certainly pressures and time constraints in a public clinic, we cannot say that they are equal, or indeed close, to EMTs responding to an emergency call for a seizure victim. Therefore, recklessness or gross negligence is the mens rea necessary to satisfy the "shocks the conscious" element in the case before us. However, we need not decide that issue, as Dr. Kim conceded that Ye had adduced sufficient evidence, much of it unrebutted, that Dr. Kim's conduct constituted recklessness.

claim.

Dr. Kim argues that dicta from this Court's decision in *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 (3d Cir. 1995), dictates that a plaintiff can make out a state-created danger claim only where a state actor has exercised power that is uniquely within the province of the state. The *Mark* Court observed that "[t]he cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their *peculiar positions* as state actors." *Id.* (emphasis added). However, this language was mere dicta and was applied to a volunteer firefighter who had committed arson, thus acting well outside the scope of his authority. Nevertheless, Dr. Kim argues that because the power he exercised, the ability to give medical advice or to serve as a doctor, was not unique to state actors, this component of the state-created danger claim cannot be satisfied.

This Court has never imposed such a requirement on state-created danger claims. Although we cited *Mark* extensively in *Bright* for its discussion of the fourth element of a state-created danger claim, we made no reference to a requirement that the affirmative action be one that is solely within the province of the state. *See Bright*, 443 F.3d at 282-84. This Court's decision in *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004), counsels even more strongly against imposing such a requirement. In *Rivas*, emergency medical technicians ("EMTs") were summoned to assist a man apparently experiencing an epileptic seizure. *Id.* at 185. The EMTs

13

summoned police to the scene, indicated that Rivas had attacked them, but did not inform them that they believed him to be epileptic. *Id.* They also did not communicate their knowledge that placing Rivas in restraints could be fatal. *Id*. at 186. Rivas died of asphyxiation. *Id*. at 187-88. His representatives brought a § 1983 action under the state-created danger theory of liability. *Id*. at 189. The *Rivas* Court dealt with the fourth element of a state created danger claim in a single paragraph, focusing entirely on whether a reasonable fact-finder could conclude that the EMTs had increased Rivas's exposure to harm. *Id*. at 197.

Indeed, it is difficult to ascertain how Ye's theory of the "authority" requirement comports with our decision in *Rivas*. 365 F.3d 186-89. The coercive and custodial functions at issue in most state-created danger cases are powers only the state may legitimately exercise. However, the EMTs' critical affirmative act was to call the police–an action that any private citizen can legitimately take. Dr. Kim's attempts to distinguish *Rivas* by arguing that emergency medical care is uniquely within the province of the state. However, much of the country's emergency medical services are now provided by private companies.[3] Even if we were to conclude that emergency

---

[3]American Medical Response is the country's largest private provider of emergency medical services and has a near monopoly in many suburban areas. *See [www.amr.net](www.amr.net)* ("AMR is locally operated in 36 states and the District of Columbia. More than 18,000 AMR paramedics, EMTs and other professionals, with a fleet of 4,400 vehicles, transport nearly

14

medical care were traditionally the province of the state, that argument would apply with equal force to medical care for the indigent.

However, there is no indication in our jurisprudence or in its Supreme Court antecedents that there exists an independent requirement that the "authority" exercised must be peculiarly within the province of the state. The "authority" language is simply a reflection of the "state actor" requirement for all § 1983 claims.

## 2. Did the state actor take an affirmative action?

Dr. Kim argues that an assurance or misrepresentation, without more, cannot constitute an "affirmative" act for purposes of the state-created danger inquiry. This Court has never expressly addressed this issue. We hold that a mere assurance cannot form the basis of a state-created danger claim.

This Court rejected a similar claim in *Bright*. 443 F.3d at 284. A police officer "assured Bright approximately three weeks before Annette's death that Koschalk would be arrested and in reliance upon these assurances, Bright failed to take defensive actions, such as leaving the area with his family, hence creating the opportunity for the damages ultimately

---

four million patients nationwide each year in critical, emergency and non-emergency situations.").

sustained." *Id*. (internal quotes omitted). The *Bright* Court stated that, even assuming this account of causation was accurate, "[s]tate-created danger liability cannot be predicated on these facts." *Id*. We concluded that, "Bright does not, and cannot, claim that the state in any way restricted his freedom to act on his family's own behalf," and invoked the *DeShaney* Court's holding that, "under these circumstances, no "affirmative duty to protect arises . . . from the State's . . . expressions of intent to help." *Id*. (citing *DeShaney*, 489 U.S. at 200) (internal quotes omitted). The police officer's assurance that someone would be arrested, an action then not taken, could not constitute an affirmative action.

The *Bright* decision reflects the concerns that animated the Supreme Court's decision in *DeShaney*. The Court observed that the "Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression." 489 U.S. at 196 (citing *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)) (internal quotes omitted); *see also Parratt v. Taylor*, 451 U.S. 527, 549 (1981) (Powell, J., concurring in result) ("It would make no sense to open the federal courts to lawsuits where there has been no affirmative abuse of power."). Speaking of the "special relationship exception," the *DeShaney* Court stated that the "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act." 489 U.S. at 200. The Court further observed that, "[i]n the substantive due process

16

analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id*.

We applied this injunction by the *DeShaney* Court that the substantive component of the Due Process Clause must be predicated on an affirmative act that works a deprivation of liberty when we observed in *Bright* that state-created danger liability could not lie because the state did not "restrict[] his freedom to act on his [] own behalf." 443 F.3d at 284. Although the *DeShaney* Court did not hold that words alone could not rise to the level of affirmative act that works a deprivation of liberty, the Supreme Court did provide two examples, incarceration and institutionalization, to guide our analysis. Ye cannot prevail unless Dr. Kim's misrepresentation that Ye had "nothing to worry about and that he [was] fine" falls into the third category of a "restraint of personal liberty" that is "similar" to incarceration or institutionalization. *DeShaney* did not conclusively answer this question, nor was the Court focused on state-created liability, giving much greater consideration to circumstances that would give rise to the special relationship exception. However, the Court made clear that a 'deprivation of liberty' is a bedrock requirement of state liability under the substantive due process clause. Ye's claim places before us the question of whether a mere assurance can constitute an affirmative act that invaded Ye's personal liberty. We implicitly rejected this argument in *Bright* and do so

17

expressly now.[4]

*DeShaney*'s factual basis strongly suggests that mere assurances do not fall into the Court's third category of 'other' restraints of personal liberty. In *DeShaney*, the Winnebago County Department of Social Services ("DSS") became aware through repeated incidents that a young boy named Joshua DeShaney was very likely receiving severe beatings from his father. 489 U.S. at 192. However, DSS did not remove the child, and he was later beaten to the point of severe brain damage. *Id*. The Court noted that DSS "specifically proclaimed, by word and by deed, its intention to protect [DeShaney] against that danger." *Id*. at 197. However, the Court did not characterize these expressions of intent to help–these assurances–as an affirmative action, stating rather that the "most that can be said of the state functionaries in this case is that they stood by and did nothing." *Id*. at 203. The dissent highlighted this point, lamenting that "to the Court, the only fact that seems to count as an affirmative act of restraining the individual's freedom to act on his own behalf is direct physical control." *Id*. at 206 (Brennan, J., dissenting). This is not a wholly accurate reflection of the Court's holding, which turned on the fact that, "[w]hile the State may have been aware

---

[4]The act that invades a plaintiff's personal liberty may not always be a restraint, as in the special-relationship context, but that is the nature of Ye's complaint. Accordingly, the instructions of the *DeShaney* Court and our holding in *Bright* are particularly applicable.

of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. Nevertheless, the language of both the majority and the dissent leave little doubt that an animating principle of the majority's decision was that an assurance, in this case an expression of intent to help, is not an affirmative act sufficient to trigger constitutional obligations.

Other courts of appeals have echoed this principle. In *Rivera v. Rhode Island*, the state allegedly promised to protect Jennifer Rivera in exchange for her testimony against Charles Pona, who was under indictment for murder. 402 F.3d 27, 30 (1st Cir. 2005). The state took no action and Rivera was shot and killed in front of her home. *Id.* The First Circuit held that "the state's promises, whether false or merely unkept, did not deprive Jennifer of the liberty to act on her own behalf nor did the state force Jennifer, against her will, to become dependent on it," and therefore could not support a state-created danger claim. *Id.* at 38. The First Circuit acknowledged that the assurances by the police may have increased Rivera's exposure to harm, but reasoned that mere assurances could not constitute deprivations of liberty—a necessary component to any state-created danger claim. *Id.* ("Merely alleging state actions which render the individual more vulnerable to harm, under a theory of state created danger, cannot be used as an end run around *DeShaney*'s core holding.").

The Eleventh Circuit took a similar approach in *Wyke v. Polk County Board of Education*, 129 F.3d 560 (11th Cir. 1997).

Shawn Wyke attempted suicide on school property and was prevented by a fellow student who related the incident to his mother. *Id*. at 564. The concerned mother who called the school was assured by the Dean of Students that "he would take care of it." *Id*. The Dean did no more than read some Bible verses to Wyke, who committed suicide shortly thereafter. *Id*. The concerned mother testified that had she not been falsely assured that the problem would be dealt with by the Dean, she would have called Wyke's mother directly. *Id*. at 570. The Court stated that the Dean "did not, either by verbal or physical act, restrain [the concerned mother] from picking up her telephone," and therefore the Dean's assurance could not support a state-created danger claim. *Id*.

Dr. Kim's assurances could, and almost certainly do, give rise to a state law medical malpractice claim. They cannot, however, constitute a deprivation of liberty within the meaning of *DeShaney* or *Bright*. *DeShaney* and *Bright* do not totally foreclose the possibility that words could constitute an affirmative act and a deprivation of liberty (such as an assault). However, these precedents make clear that assurances of well-being are not "affirmative" acts within the meaning of the fourth element of a state-created danger claim.

20

### 3. Did this act create a danger to the citizen or render the citizen more vulnerable to danger than if the state had not acted at all?

Dr. Kim argues that Ye's allegations, which must be taken as true for purposes of this appeal, do not establish that he made Ye more vulnerable to harm than if he had never acted.

In *Bright*, this Court held that, if the other elements of a state-created danger claim are met, the state must have "rendered the citizen more vulnerable to danger than had the state not acted at all." 443 F.3d at 281; *see also D.R.*, 972 F.2d at 1373 (noting that the relevant inquiry is "whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it"). We have often adopted the language of "but for" causation when describing this last requirement of state-created danger liability. *See Rivas*, 365 F.3d at 197 (noting that the state-created danger test asks "whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur," and that, "[w]ere it not for [the state's] acts," no harm would have occurred); *Kneipp*, 95 F.3d at 1209 (observing that the jury could conclude that the officers' conduct was the "but for" cause of the injury, and that their conduct "greatly increased" the likelihood of harm). We noted in *Kaucher v. County of Bucks* that, "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." 455 F.3d 418, 432 (3d Cir. 2006) (citing *Smith*, 318 F.3d at 510 (holding the fourth element asks if "but

21

for the defendants' actions, the plaintiff would have been in a less harmful position")).

Ye's allegations, which must be taken as accurate, state that, but for Dr. Kim's assurances, he and his son would have gone to the emergency room. Ye's expert testimony established a likelihood that, had they done so, the substantial harms that followed would have been avoided.[5] This is

_____

[5]Dr. Charles Faselis, an expert witness for Ye, testified that:

> Mr. Ye has permanent and devastating complications which could have been avoided if he had only received the necessary and required cardiac work up and the immediate, emergency hospitalization required. . . . Mr. Ye's critical care polyneuropathy and current condition is a direct result of Dr. Tuan and Dr. Kim's failure to obtain the required cardiac work up, and failure to hospitalize him before his collapse and need for emergency resuscitation and bypass surgery.

Dr. S.J. Schneller, also an expert witness for Ye, testified that:

> It is my opinion, to a reasonable degree of medical certainty, that it was well below the standard of care for Mr. Ye's physicians, Dr.

22

Tuan and Dr. Kim, to fail to refer him to a cardiologist and to fail to provide necessary medical treatment for his life-threatening condition and to disregard the known risks and that such wrongful conduct significantly increased the risk of harm to Mr. Ye and in fact caused his injuries.

\* \* \*

It is my opinion, to a reasonable degree of medical certainty that, had Mr. Ye been referred to a cardiologist and timely hospitalized, the patient's hypertension, hypercholesterolemia, and angina pectoris would have been effectively treated and that the risk of heart attack, heart failure, pulmonary edema, near respiratory arrest would have been significantly reduced. It is my opinion that, had Mr. Ye been referred to a cardiologist in a timely fashion, the risk that he would have required emergency intubation, emergency mechanical ventilation, emergency cardiac catheterization, emergency insertion of an intra-aortic balloon pump and emergency coronary artery surgery would have been significantly reduced.

\* \* \*

[Ye's] problems, including the critical care neuropathy and its sequella, are directly related to the severity of the patient's presenting condition

23

sufficient to satisfy "but for" causation, which is the standard in this Circuit.

## III.    Conclusion

Dr. Kim committed no constitutional tort.[6]  Dr. Kim did not deprive Ye of his liberty, and therefore did not violate the substantive component of the Due Process Clause.  We will reverse the District Court's denial of summary judgment for Dr. Kim, as no facts have been alleged that could support state-created danger liability.

---

which itself is a direct consequence of the failure of Mr. Ye's treating physicians to refer him to a cardiologist for appropriate management of his heart disease and hospitalization as the standard of care required.

[6]As there was no constitutional tort, we need not reach the question of whether the law was clearly established at the time of Dr. Kim's assurance to Ye for qualified immunity purposes.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).