Pamela **SANDERS**, Administrator
of Estate of Tyrique Lovett,
et. al., Plaintiffs,

v.

**CITY OF PHILADELPHIA,**
et al., Defendants.

No. 06–CV–359.

United States District Court,
E.D. Pennsylvania.

Oct. 2, 2007.

---

Christopher L. Giddings, David F. Binder, Raynes McCarty Binder Ross & Mundy, Philadelphia, PA, for Plaintiff.

Lynne A. Sitarski, City of Philadelphia Law Department, Chief Deputy City Solicitor, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiffs Pamela Sanders and Horace L. Lovett, the dual administrators of the Estate of Tyrique Lovett, bring this action for violation of their civil rights and their state law rights against defendant City of Philadelphia.[1] Plaintiffs bring their civil rights claim under 42 U.S.C. § 1983 based on the allegation that defendant violated plaintiffs' Fourteenth Amendment Due Process Clause rights. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. The defendant has moved for summary judgment as to all counts. As plaintiffs have failed to raise or discuss their state law claims in their response to defendant's motion, I will consider those claims withdrawn. Accordingly, the sole matter before me is whether there exists a legally sufficient evidentiary basis for plaintiffs' claim that defendant deprived Tyrique Lovett of his substantive due process rights. For the reasons set forth below, I find there is insufficient evidence to support this claim and I will therefore grant defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND

For purposes of summary judgment, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Here, the facts are stated in the light most favorable to the plaintiff, and all reasonable inferences are drawn in plaintiff's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

---

1. Plaintiffs have chosen to drop their case against all other defendants. As stated by plaintiffs, in Plaintiffs Response to Defendants' Second Motion for Summary Judgment, "[p]laintiffs are pursuing their case only against the City of Philadelphia."

This lawsuit arises out of the shooting death of fifteen year old Tyrique Lovett ("Lovett"). On December 22, 2004, Lovett was standing on the sidewalk near his home when he was shot in a drive-by shooting on the 2000 block of South Alden Street.[2] A bullet entered Lovett's right femoral artery, which caused severe non-stop bleeding. Immediately after the shooting, Lovett went inside his grand-mother's house located at 2034 South Alden Street. While Lovett was inside the house, Lovett's mother, Pamela Sanders ("Sanders"), called 911. Before anyone could arrive on the scene, Sanders grabbed a sheet and began to wrap Lovett's wound. (Sanders dep. at 19).

In response to a 911 call, Philadelphia police officers arrived at the scene. Officer Travis and Officer Wooding arrived after several other police vehicles had already arrived at the scene. Because South Alden Street is a one-way street with parking on one-side and only one lane of traffic, the street was already blocked by other police vehicles and the officers had to park down the block from the shooting. (Wooding dep. at 28). Officers Travis and Wooding located Lovett inside 2034 South Alden. When they entered the house they found Lovett lying face down in a pool of blood. (Wooding dep. at 20–21). Lovett's grandfather asked the officers to take Lovett to the hospital. Although Lovett was seriously injured, he was able to use his own strength to help the officers get him onto the stretcher. (Wooding dep. at 21). Once Lovett was on the stretcher, the officers "zoomed down the street," rushing to get him to the hospital. (Sanders dep. at 39 and Douglas dep. at 27).

The officers carried Lovett half of a block to their Philadelphia Police Emergency Patrol Wagon ("patrol wagon"). (Travis dep. at 14). Officer Wooding and Officer Travis decided to take Wooding to the hospital in the patrol wagon because neither of them saw an ambulance at the scene and it was protocol, if rescue was not available and an injury was very severe, to immediately transport the victim to a hospital in the patrol wagon. (Travis dep. at 7). However, both Sanders and Kenny Ridges ("Ridges"), a neighbor, saw an ambulance, which was parked near 2036 South Alden Street, when Lovett was carried out of the house on a stretcher. The officers provided no medical treatment to Lovett before placing him in the patrol wagon. Neither officer had been trained in the handling of trauma victims, with the exception of a yearly course that lasted a couple of hours. (Travis dep. at 8 and Wooding dep at 26).

Once the officers placed Lovett in the patrol wagon, it took them about three to four minutes to leave the scene for the hospital.[3] (Sanders dep. at 27). Officer Wooding drove the patrol wagon and Officer Travis traveled in the back with Lovett. There was no medical equipment in the patrol wagon and no first aid kit. Lovett was spurting blood from his leg, but Officer Travis made no attempt to stop the bleeding from his upper thigh. When asked why he made no attempts to stop the bleeding, Officer Travis explained that he made no attempts because Lovett was moving around a lot, probably due to shock, and Travis could not hold Lovett down. (Travis dep. at 19–20).

2. Lovett was not the only victim of the drive-by-shooting. When police officers arrived at the scene they were confronted with several gunshot victims.

3. The three to four minute estimate was provided by Sanders. However, Officer Wooding and Officer Travis both state that it took them less than a minute to leave after Lovett was placed in the vehicle. (Wooding dep. at 29 and Travis dep. at 23–24).

The patrol wagon lights and sirens were on during the trip, which lasted between three to five minutes. (Wooding dep. at 31 and Travis dep. At 24). While en route to the hospital. Officer Wooding notified the Hospital of the University of Pennsylvania (HUP) that they were bringing a gunshot victim. When they arrived, hospital personnel were waiting to transport Lovett into the hospital.

Sanders was driven by a friend to the hospital. About twenty minutes after she arrived, a doctor informed her that Lovett's condition was serious, but that he was conscious. Ten minutes later, the doctor returned and told Sanders that Lovett's blood pressure had dropped and Lovett had passed away.

It is the opinion of Dr. Andrew Newman that the officers' failure to apply pressure to the wound, during the ride to the hospital, substantially increased the risk that Lovett would bleed to death.[4]

## II. LEGAL STANDARD

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the exis-

tence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

Plaintiffs allege that defendant violated Lovett's substantive due process rights and seek award of damages for this constitutional violation under 42 U.S.C. § 1983. I therefore begin my analysis with a discussion of the requirements for establishing a constitutional claim under 42 U.S.C. § 1983. The pertinent language of section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.), *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995). In order to

---

**4.** This fact was presented to the Court in the form of a letter addressed to plaintiffs and written by Dr. Andrew Newman. Whether this letter falls within the ambit of Fed. R.Civ.P. 56(e) admissible evidence is unnecessary to determine because it is not a material fact in determining summary judgment.

establish a section 1983 claim, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Mark,* 51 F.3d at 1141 (quoting *Moore v. Tartler,* 986 F.2d 682, 685 (3d Cir.1993)).

■ Plaintiffs bring suit under 42 U.S.C. § 1983 based on the claim that the City of Philadelphia violated the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Plaintiffs do not allege a violation of procedural due process, but contend that defendant deprived Lovett of his substantive due process rights. In general, state actors do not have an affirmative obligation to protect citizens from private violence. The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Soc. Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). For this reason, "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S.Ct. 998. This principle, outlined in *DeShaney,* has led the Third Circuit to conclude that "there is no federal constitutional right to rescue services, competent or otherwise. Moreover, ... it follows that we cannot interpret that clause so as to place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them." *Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med.*

*Servs. Training Inst.,* 318 F.3d 473, 478 (3d Cir.2003).

■ There are, however, two exceptions to the presumption against state responsibility for the acts of private tortfeasors: (i) cases where there exists a "special relationship" between the individual and the state, such that the state has a duty to protect the health and safety of the individual, *see DeShaney,* 489 U.S. at 197–201, 109 S.Ct. 998; *D.R. v. Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1369 (3d Cir.1992); and (ii) cases where a "state-created danger" causes harm to an individual. *See Brown,* 318 F.3d at 478–79; *Nicini v. Morra,* 212 F.3d 798, 807 n. 6 (3d Cir.2000) (en banc); *Kneipp v. Tedder,* 95 F.3d 1199, 1204–5 (3d Cir.1996). Plaintiffs contend that both of these exceptions apply to the case at hand and therefore the City of Philadelphia violated Lovett's constitutional rights.

### A. Special Relationship

■ The special relationship exception derived from *DeShaney* and stands for the proposition "that even if the Due Process Clause imposes no affirmative obligation on the State to provide the general public with adequate protective services, such a duty may arise out of a certain 'special relationship' created or assumed by the State with respect to particular individuals." *DeShaney,* 489 U.S. at 197, 109 S.Ct. 998. In *DeShaney,* the Supreme Court limited this special relationship exception to situations in which "the State takes a person into its custody and holds him there against his will." *Id.* at 199–200, 109 S.Ct. 998. The Supreme Court provided the rationale for this exception:

[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human

needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 200, 109 S.Ct. 998. *DeShaney* did not fully determine the contours of the special relationship exception, but instead limited it to situations in which the state affirmatively acted to restrain an "individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty."[5] *Id.*

In *D.R.*, 972 F.2d at 1370, the Third Circuit stated that "[o]ur court has read *DeShaney* primarily as setting out a test of physical custody." However, the *D.R.* Court went one step further to explain that not all custody created a special relationship that falls within the exception. *Id.* at 1371. As *D.R.* explained:

[t]he state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restriction of liberty in both environments. Institutionalized persons are wholly dependant upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. Obviously, they are not free to leave.

*Id.* In *D.R.*, the plaintiffs, high school students, alleged that while attending class in their public high school they were sexually molested by other students. *Id.* at 1366.

Although school attendance was mandatory and the state stood in loco parentis, the Third Circuit held that this type of custody was not sufficient to trigger the special relationship exception. *Id.* at 1372. No special relationship existed because the students were free to leave school everyday, their parents could remove them from school, and they had access to outside sources of help. *Id.* Furthermore, the Third Circuit emphasized that unlike the institutionalized or imprisoned, "[s]tudents ... do not depend upon the schools to provide for their basic human needs. Public school students are required to spend only 180 six-hour days in the classroom per year." *Id.*

Other Third Circuit cases further the principle that physical custody alone is not enough to create a special relationship. Accordingly, the Third Circuit recognized in *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 466 (3d Cir. 1990), that the special relationship exception "must be confined to cases in which a person is taken into state custody against his will." See also *Torisky v. Schweiker*, 446 F.3d 438, 446 (3d Cir.2006) (stating that "a custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger the protections of *Youngberg*"). In *Fialkowski*, the Third Circuit refused to extend the special relationship exception to a severely retarded adult male because his parents had voluntarily placed him in the custody of a community health center and he "enjoyed considerable freedom of movement." *Id.* at 465–66.

██ In the instant case, plaintiffs claim that a special relationship existed between the City of Philadelphia and Lovett be-

---

**5.** The Supreme Court in *DeShaney* held that no special relationship existed between the state and a child who had previously been in the custody of the state, but at the time of injury was in his father's custody. 489 U.S. at 201, 109 S.Ct. 998.

cause police officers placed Lovett on a stretcher and "confined" him to the back of a patrol wagon while they drove him to the hospital, a task that lasted approximately ten minutes. Although this may fall within the dictionary definition of custody, it is not the sort of custody necessary to trigger the special relationship exception. Similar to *Fialkowski*, Lovett voluntarily entered custody. Although Lovett had been shot, when the officers arrived at the scene he helped them by climbing onto the stretcher. Additionally, there is no evidence that Lovett protested the officers transporting him to the hospital or that he was not free to refuse transportation. Even if Lovett could not leave the wagon, a ten minute ride in the back of a patrol wagon does not qualify as a "substantial curtailment over an individual's freedom." As the Court held in *DeShaney*, for custody to create a special relationship, requires deprivation of an individual's basic needs. Lovett was not deprived of his basic needs. He had ample opportunity before and after the ride in the wagon to satisfy those needs. Finally, if the Third Circuit in *D.R.* did not find 180 days of custody for 6 hours each day the type of custody required for the special relationship exception, then surely ten minutes of custody is not enough. For these reasons, the special relationship exception is inapplicable to the plaintiffs.

## B. State Created Danger

The state created danger basis for liability originally emanated from a suggestion in *DeShaney* that "[w]hile the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, at 201, 109 S.Ct. 998. This exception to the principle adopted in *DeShaney* that the state has no responsibility to protect its citizens from the violent acts of private parties was spe-

cifically adopted by the Third Circuit in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). The Third Circuit adopted a four prong test to determine the applicability of the state created danger exception. *Kneipp*, at 1208 (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.1995)). Since *Kneipp*, the four prong test has been refined and a successful state created danger claim now requires the following four elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir.2006) (quotations and footnotes omitted).

■ In order to overcome a summary judgment motion, a plaintiff must show that each prong of the state created danger exception raises a genuine issue of material fact. Rather than examine each element of the state created danger exception, I will focus solely on prong two because plaintiffs' failure to establish this prong of the test suffices to explain why plaintiffs' lack a viable state created danger claim.

■ The second element of the state created danger exception requires that "a state actor acted with a degree of culpabili-

ty that shocks the conscience." *Id.* In substantive due process cases, "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir.1999). The Third Circuit has reached the conclusion that "the level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. In a 'hyperpressurized environment,' an intent to cause harm is usually required." *Sanford v. Stiles,* 456 F.3d 298, 309 (3d Cir. 2006). Situations requiring rapid-decision making typically require the defendant to possess a mens rea of intent-to-harm. *Ye v. United States,* 484 F.3d 634, 639 (3d Cir.2007).

In *Brown,* the Third Circuit examined facts similar to the case at hand. There the plaintiffs brought a state created danger claim against defendants for an alleged failure to timely provide ambulance service. *Brown,* 318 F.3d at 475–76. Plaintiffs' son had choked on a grape and plaintiffs had called 911. *Id.* at 475. Unfortunately, an ambulance did not arrive until ten minutes after the call had been placed and the victim later died from asphyxia. *Id.* at 476. Although the Third Circuit recognized the tragedy of the event, records indicated that the EMTs arrived at the scene as quickly as possible and that "the delay in reaching [the victim] was not caused by [defendants] purposely delaying their rescue efforts or acting in an otherwise outrageous manner." *Id.* At 481. The Third Circuit affirmed the grant of defendants' summary judgment motion because "[a]lthough [defendants] may have ultimately failed to rescue [the victim] successfully from a pre-existing danger, we have already said that they had no constitutional obligation to do so. We cannot say their actions in attempting a failed rescue shocks the conscience." *Id.* at 481–82.

In *Hansberry v. City of Philadelphia,* 232 F.Supp.2d 404 (E.D.Pa.2002), I addressed an even more similar set of facts than *Brown.* In *Hansberry,* plaintiffs were suing on behalf of their dead son who had been shot by a third party and was then transported by police officers to the hospital. 232 F.Supp.2d at 406. Plaintiffs state created danger claim rested on the allegation that the police officers' decision to transport the victim in a patrol wagon, rather than wait for an ambulance increased the victim's risk of dying and violated his substantive due process rights. *Id.* The record reflected that the officers were concerned for the victim's well being and focused on getting the victim to the hospital. *Id.* at 410. I granted defendants' summary judgment motion because plaintiffs were unable to establish police action "that is so ill-conceived or malicious that it shocks the conscience." *Id.* at 410–11 (quoting *Nicini,* 212 F.3d at 810).

The facts of the current case indicate that the police officers were forced to make a split-second decision in their attempt to rescue Lovett. When police arrived at the scene they were confronted with multiple gun shot victims before they found Lovett face down in a pool of his own blood. Because the defendant lacked time to deliberate, the appropriate level of culpability required to establish that defendant's actions shock the conscience is proof that the defendant intended to harm Lovett. I find that the defendant lacked the intent-to-harm necessary to shock the conscience.

There is no indication in this case that the defendant acted maliciously or possessed any ill will toward Lovett. Quite to the contrary, uncontested deposition transcripts from the officers demonstrate their concern for the victim. As soon as the officers located the victim they placed him on a stretcher and rushed him to their

patrol wagon. While en route to the hospital, the officers used both their lights and sirens to move quickly through traffic. Additionally, the officers called the hospital during their drive in order to have hospital personnel waiting for them when they arrived. Although plaintiffs allege that the police officers improperly transported Lovett in a patrol wagon rather than an ambulance, which they allege was on the scene, this fact does indicate an intent-to-harm, but at most is a tragic mistake. The police officers' actions do not shock the conscience. I cannot find that plaintiffs offered sufficient evidence to satisfy the second prong of the state created danger exception. Therefore, the state created danger exception is inapplicable to plaintiffs' case.

## IV. CONCLUSION

What happened to Tyrique Lovett is truly a tragedy. However, his life was cut short by the actions of a private actor and not the City of Philadelphia. Plaintiffs have failed to prove that the facts of this case fit within either the special relationship exception or the state created danger exception to the general rule in *DeShaney* that the state has no affirmative duty to provide competent rescue services. For the foregoing reasons, I grant Defendant's Motion for Summary Judgment.

### ORDER

**AND NOW**, on this 2nd day of October, 2007, **IT IS ORDERED:** Defendant's Motion Pursuant to Judge Brody's Preferred Procedure on Summary Judgment and Rule 56 of the Federal Rules of Civil Procedure (docket entries # 25 & 31) is **GRANTED**.