OPINION OF THE COURT
McKEE, Chief Circuit Judge,
with whom SLOVITER, SCIRICA, RENDELL, AMBRO (joining in judgment as expressed), SMITH, FISHER, CHAGARES, HARDIMAN, and GREENAWAY, JR., Circuit Judges join.
As is so often the case, the issues in this appeal arise from unsettling facts presented by sympathetic plaintiffs.[1] We are asked to decide whether public schools have a constitutional duty to protect students from abuse inflicted by fellow students under the circumstances alleged here.
Appellants, Brittany and Emily Morrow, and their parents, Bradley and Diedre Morrow, brought this action against Black-hawk School District and Blackhawk High School’s Assistant Principal, Barry Bala-ski.[2] The Morrows claim that Brittany and her sister Emily were subjected to bullying in the form of a series of threats, assaults, and acts of racial intimidation at the hands of a fellow student and her accomplice. Unable to .obtain help from school officials, the Morrows were ultimately compelled to remove their children from their school. Thereafter, the Morrows brought suit alleging that school officials denied them substantive due process under the Fourteenth Amendment by not protecting Brittany and Emily. The Third Amended Complaint (the “Complaint”) asserted a cause of action under 42 U.S.C. § 1983 and a supplemental state law claim for “negligence and/or gross or willful misconduct.”
The District Court dismissed the Complaint based on our decision in D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir.1992) (en banc). There, we concluded that the school did not have a “special relationship” with students that would give rise to a constitutional duty to protect them from harm from other students given the alleged facts. See id. at 1372 (finding that “no special relationship based upon a re *164 straint of liberty exists here”). The District Court also held that the injury the Morrows complained of was not the result of any affirmative action by the Defendants. Accordingly, the court held that the Defendants are not liable under the “state-created danger” doctrine. The District Court therefore dismissed the Morrows’ Complaint, and this appeal followed. The appeal was initially argued before a panel of this Court. Thereafter, we granted en banc review to reexamine the very important questions raised by the allegations in the Complaint.
We now affirm the judgment of the District Court and hold that the allegations do not establish the special relationship or the state-created danger that must exist before a constitutional duty to protect arises under the Fourteenth Amendment.
I. FACTUAL AND PROCEDURAL BACKGROUND
A. Factual Background
Brittany and Emily Morrow attended Blackhawk High School in Beaver County, Pennsylvania.[3] Beginning in January 2008, they were subjected to a series of threats and physical assaults by Shaquana Anderson, a fellow student. Specifically, on January 5, 2008, Anderson threatened Brittany by phone and on a MySpace blog.[4] Two days later, Anderson physically attacked Brittany in the school’s lunch room. Pursuant to its “No Tolerance Policy,” the school suspended both girls for three days. Brittany’s mother also reported Anderson to the local police at the recommendation of Assistant Principal Ba-laski. As a result, Anderson was charged with simple assault, terroristic threats, and harassment. Nevertheless, Anderson continued to bully Brittany and Emily. In fact, shortly after she returned to school, Anderson again attacked Brittany by attempting to throw her down a set of stairs. During that incident, Anderson allegedly called Brittany a “cracker,” told her that she was “retarded” and “had better learn to fight back,” and asked “why don’t you learn to talk right?”
On April 9, 2008, Anderson was placed on probation by the Court of Common Pleas of Beaver County, Juvenile Division, and ordered to have no contact with Brittany. Five months later, Anderson was adjudicated delinquent by a Juvenile Master of that court, and was again ordered to have no contact with Brittany. Copies of both of these “no-contact” orders were provided to the school and to Assistant Principal Balaski.
Despite the court’s intervention, on September 12, 2008, Anderson boarded Brittany’s school bus, even though that bus did not service Anderson’s home route. Anderson threatened Brittany, and she elbowed Brittany in the throat at a school football game that evening. A few days later, Abbey Harris, Anderson’s friend, struck Emily in the throat. These incidents were reported to school officials.
The Morrows subsequently met with school officials, but they responded by telling the Morrows that they could not guarantee Brittany and Emily’s safety. Instead, rather than removing Anderson and *165 her confederate from the school, school officials advised the Morrows to consider another school for their children. In October 2008, the Morrows enrolled their daughters in a different school.
B. Procedural History
The Morrows thereafter filed this suit pursuant to 42 U.S.C. § 1983, alleging a violation of their Fourteenth Amendment substantive due process rights.[5] They also included a supplemental state law claim against Assistant Principal Balaski for “negligence and/or gross and willful misconduct.” The Morrows acknowledge that the Fourteenth Amendment’s Due Process Clause does not generally impose an affirmative duty on the state to protect individuals from harm caused by private citizens. However, they argue that the general rule is not applicable because the Defendants had a “special relationship” with Brittany and Emily. They also argue that the Defendants are hable because they created the dangerous situation in which Brittany and Emily found themselves, and that circumstance gave rise to a duty to protect the Morrow sisters from that danger.
The District Court dismissed the Morrows’ Complaint with prejudice, and declined to exercise supplemental jurisdiction over the state law claim.[6] In its written opinion, the District Court explained that we have held that there is no special relationship between public school authorities and students. The court also concluded that the Morrows had “identified no action of the Defendants that utilized their authority in a way that rendered Minor Plaintiffs more vulnerable than they would have been otherwise.” Morrow v. Balaski, No. 10-cv-292, 2011 WL 915863, at *5 (W.D.Pa. Mar. 16, 2011). Although the District Court noted that it was “sympathetic to Plaintiffs’ plight,” it nevertheless concluded that the Morrows “have not stated a cause of action under current Third Circuit case law.” Id.
This appeal followed.[7]
II. STANDARD OF REVIEW
Our review of a district court’s dismissal under Federal Rule of Civil Procedure 12(b)(6) is plenary. Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 163 (3d Cir.2010). “Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiffs claims lack facial plausibility.” Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir.2011). Although we must accept the allegations in the complaint as true, “we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.” Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir.2007) (citations and internal quotation marks omitted).
III. DISCUSSION
To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by *166 the Constitution or laws of the United States. Nicini v. Morra, 212 F.3d 798, 806 (3d Cir.2000) (en banc). Accordingly, “[t]he first step in evaluating a section 1983 claim is to ‘identify the exact contours of the underlying right said to have been violated’ and to [then] determine ‘whether the plaintiff has alleged a deprivation of a constitutional right at all.’ ” Id. (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).
As we noted at the outset, the Morrows’ § 1983 claim rests on the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides that a state shall not “deprive any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV, § 1; The Morrows invoke the substantive component of due process, which “protects individual liberty against ‘certain government actions regardless of the fairness of the procedures used to implement them.’ ” Collins v. City of Marker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Specifically, the Morrows allege that school officials violated a liberty interest by failing to protect Emily and Brittany from the threats and assaults inflicted by fellow students.
Like the District Court, we are sympathetic to the Morrows’ plight. Brittany and Emily were verbally, physically and— no doubt — emotionally tormented by a fellow student who was adjudicated delinquent based on her actions against the Morrow sisters. When the Morrows requested that the Defendants do something to protect Brittany and Emily from the persistent harassment and bullying, school officials responded by suggesting that the Morrows consider moving to a different school rather than removing the bully from the school.
We therefore certainly understand why the Morrows would conclude that the school’s response to the abuse inflicted on their daughters was unfair and unjust. Nevertheless, our adjudication of the Morrows’ claims must be governed by Supreme Court precedent. As we shall explain, it is also guided by authoritative Supreme Court dicta.
The Supreme Court has long established that “[a]s a general matter, ... a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.” DeShaney v. Winnebago Cnty. Dep’t of Social Servs., 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Due Process Clause forbids the state itself from depriving “individuals of life, liberty, or property without ‘due process of law,’ but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.” Id. at 195, 109 S.Ct. 998.
In DeShaney, the Winnebago County Department of Social Services received ongoing reports from family friends and medical personnel that a four-year old boy (“Joshua”) was suffering physical abuse at the hands of his father. At one point, the state obtained a court order placing Joshua in the temporary custody of the local hospital, but later returned him to the custody of his abusive father. Following Joshua’s return, the county social worker assigned to the case continued to document multiple incidents of suspected abuse. Despite these reports, the county failed to remove Joshua from his father’s custody. Eventually, the father beat Joshua so badly that the boy suffered permanent brain damage. Joshua and his mother sought redress by suing the county *167 under § 1983. They argued that the county had denied them substantive due process under the Fourteenth Amendment by not protecting Joshua from his father. Id. at 191-93,109 S.Ct. 998.
Despite these “undeniably tragic” facts, id. at 191, 109 S.Ct. 998, the Supreme Court held that the county’s failure to provide Joshua with adequate protection against his father’s violence did not amount to a substantive due process violation. The Court explained that the Due Process Clause limits state governments but does not generally impose an affirmative obligation upon states to protect individuals from private citizens. Id. at 195— 96, 109 S.Ct. 998. However, the Court carved out a very narrow exception to that general rule wherein the Constitution does “impose[ ] upon the State affirmative duties of care and protection with respect to particular individuals.” Id. at 198, 109 S.Ct. 998. That exception has come to be known as the “special relationship” exception. It applies when a special relationship has been established because “the State takes a person into its custody and holds him there against his will.” Id. at 199— 200,109 S.Ct. 998.
In addition to the special relationship exception, we have recognized that the Due Process Clause can impose an affirmative duty to protect if the state’s own actions create the very danger that causes the plaintiffs injury. See Kneipp v. Tedder, 95 F.3d 1199, 1201 (3d Cir.1996). In Kneipp, police officers stopped Kneipp and her husband for causing a disturbance on a highway while they were walking home from a bar, but they thereafter allowed Kneipp’s husband to continue to their home to tend to their son. Kneipp’s husband later testified that because his wife was drunk, he assumed the officers would take her to the hospital or to the police station. However, the officers abandoned her despite her obvious intoxication, thereby forcing her to walk home alone in the cold. She subsequently fell down an embankment and suffered hypothermia resulting in permanent brain damage. Id. at 1201-03. In the subsequent suit against the state under § 1983, we held that the officers’ conduct denied Kneipp her Fourteenth Amendment right to substantive due process because the actions of the police created the danger that caused her injury. Id. at 1213.
Accordingly, the Morrows can state a claim under § 1983 if they have adequately alleged circumstances giving rise to a “special relationship” between their daughters and the Defendants pursuant to DeSha-ney, or if their Complaint adequately alleges affirmative conduct on the part of the Defendants to support the “state-created danger” exception that we adopted in Kneipp.
A. Special Relationship
As the Court instructed in DeSha-ney, an affirmative duty to protect may arise out of certain “special relationships” between the state and particular individuals. See DeShaney, 489 U.S. at 197-98, 109 S.Ct. 998. The Supreme Court has found that the relationship between the state and its incarcerated or involuntarily committed citizens is the kind of “special relationship” that creates an affirmative duty upon the state to provide adequate medical care to incarcerated prisoners, see Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and to ensure the “reasonable safety” of involuntarily committed mental patients, Youngberg v. Romeo, 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Estelle and Youngberg, “[tjaken together ... stand ... for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution *168 imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.” DeShaney, 489 U.S. at 199-200, 109 S.Ct. 998.
It is clear from the decision in De-Shaney that the state’s constitutional “duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.” Id. at 200, 109 S.Ct. 998. In other words, “it is the State’s affirmative act of restraining the individual’s freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty&emdash;which is the ‘deprivation of liberty’ triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.” Id. (emphasis added).
A minor child attending public school most certainly does not have the freedom of action or independence of an adult.[8] Nevertheless, the Supreme Court has not had occasion to specifically decide whether that is sufficient to create a special relationship between public schools and their students under the Due Process Clause. We have, however, previously considered the application of the special relationship doctrine in the public school context. In D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir.1992), a sixteen-year-old hearing and communication-impaired student (“D.R.”) and a seventeen-year-old classmate (“L.H.”) alleged that several male students physically, verbally, and sexually assaulted them during a graphic arts class during the school day over a period of several months. The male students forced them into the classroom’s unisex bathroom or darkroom and physically abused and sexually molested the plaintiffs multiple times per week. A student teacher was present in the classroom when the abuses occurred. Although D.R. did not claim to have informed her of the situation, D.R. alleged that the teacher either heard the assaults or should have heard them. L.H. alleged that she complained to the school’s assistant director about the boys’ conduct, but he took no action. Middle Bucks, 972 F.2d at 1366.
Although we recognized the horrific nature of the allegations, we nevertheless held that “the school defendants’ authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in DeShaney.” Id. at 1372. We rejected the plaintiffs’ argument that Pennsylvania’s compulsory school attendance laws and the school’s exercise of in loco parentis authority over its students so restrain the students’ liberty that they can be considered to have been in state “custody” during school hours for Fourteenth Amendment purposes. Id. at 1370-72. Our conclusion was largely informed by the fact that “parents remain the primary caretakers, despite their [children’s] presence in school.” Id. at 1371. We explained that “[t]he Estelle-Youngberg type custody referred to by the Court in DeShaney ... is to be sharply contrasted with D.R.’s situation.” Id. Although the doctrine of in loco parentis certainly cloaks public schools with some authority over school children, see, e.g., Morse v. Frederick, 551 U.S. 393, 413-14, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (reviewing *169 legal doctrine of in loco parentis), that control, without more, is not analogous to the state’s authority over an incarcerated prisoner or an individual who has been involuntarily committed to a mental facility.
Nonetheless, when we decided Middle Bucks, the Supreme Court’s jurisprudence allowed room to debate this issue because the Court had not enumerated the parameters of the control or custody required for the creation of a special relationship under the Fourteenth Amendment. Accordingly, in a compelling dissent to the Middle Bucks majority, then-Chief Judge Sloviter argued for a “functional” approach to “custody”:
I believe that we are free to decide ... that the state compulsion that students attend school, the status of most students as minors whose judgment is not fully mature, the discretion extended by the state to schools to control student behavior, and the pervasive control exercised by the schools over their students during the period of time they are in school, combine to create the type of special relationship which imposes a constitutional duty on the schools to protect the liberty interests of students while they are in the state’s functional custody.
Middle Bucks, 972 F.2d at 1377 (Sloviter, C.J., dissenting, joined by Mannsmann, Scirica and Nygaard, JJ.); see also Maldonado v. Josey, 975 F.2d 727, 733 (10th Cir.1992) (Seymour, J., concurring) (“I would ... hold that a child legally required to attend school and thereby forced into the temporary day-time custody of the state’s agents is constitutionally entitled to some level of protection from harm and care for basic safety.”).
However, after our decision in Middle Bucks, the Supreme Court decided Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). There, the Court clarified the applicability of DeShaney’s special relationship exception in the context of public schools. The specific issue in Vemonia was whether a public school’s policy requiring student athletes to submit to random drug testing violates the Fourth Amendment. Id. at 648, 115 S.Ct. 2386. In holding that such a policy does not violate the Fourth Amendment, the Court noted: “Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster.” Id. at 654, 115 S.Ct. 2386. The Court then stated: “[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional ‘duty to protect.’ ” Id. at 655, 115 S.Ct. 2386 (citing DeShaney, 489 U.S. at 200, 109 S.Ct. 998).
Although that statement is technically dictum, we have previously explained that we cannot lightly ignore the force of Supreme Court dicta. See In re McDonald, 205 F.3d 606, 612-13 (3d Cir.2000).[9] Moreover, although the statement was made in the context of the Court’s analysis of a student athlete’s reasonable expecta *170 tion of privacy in public schools, the citation to DeShaney is no less pertinent to our inquiry because it provides insight into the Court’s interpretation of DeShaney’s application to public schools. Indeed, short of an actual holding on the precise issue here, it is difficult to imagine a clearer or more forceful indicator of the Court’s own interpretation of DeShaney and the special relationship exception recognized there as applied to public schools. See id. (“The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket.”).
In addition, every other Circuit Court of Appeals that has considered this issue in a precedential opinion has rejected the argument that a special relationship generally exists between public schools and their students. See, e.g., Hasenfus v. LaJeunesse, 175 F.3d 68, 69-72 (1st Cir.1999); Doe v. Covington Cnty. Sch. Dist., 675 F.3d 849, 857-58, 863 (5th Cir.2012) (en banc); Doe v. Claiborne Cnty., 103 F.3d 495, 509-10 (6th Cir.1996); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 268, 272-73 (7th Cir.1990); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 731-33 (8th Cir.1993); Patel v. Kent Sch. Dist., 648 F.3d 965, 972-74 (9th Cir.2011); Maldonado v. Josey, 975 F.2d 727, 729-33 (10th Cir.1992); Wyke v. Polk Cnty. Sch. Bd., 129 F.3d 560, 568-69 (11th Cir.1997).[10]
Accordingly, the Supreme Court’s dictum in Vemonia as well as the consensus from our sister Circuit Courts of Appeals both reinforce our conclusion that public schools, as a general matter, do not have a constitutional duty to protect students from private actors. We know of nothing that has occurred in the twenty years since we decided Middle Bucks that would undermine this conclusion. We therefore find the dissent’s assertion here that “factual developments since Middle Bucks have further undercut its rationale,” Fuentes Dissent 195, unpersuasive. The first two examples our dissenting colleagues offer of “schools exercising greater control over students” include the use of technology tracking student movement to ensure they are in class[11] and the monitoring of social media activity by students.[12] Id. Such examples merely illustrate new precautionary measures some schools have undertaken in response to emerging technology. It is difficult to see how such measures constitute limitations on a student’s “freedom to act on his own behalf,” see DeShaney, 489 U.S. at 200, 109 S.Ct. 998, that are so severely restrictive as to equate public school students with prisoners or those who are involuntarily committed to secure mental institutions.
Similarly, a school’s exercise of authority to lock classrooms in the wake of tragedies such as those that have occurred in New-town, Connecticut and Colombine, Colorado, see Fuentes Dissent 195-96, may be a relevant factor in determining whether a *171 special relationship or a state-created danger exists in those specific cases. However, the fact that certain schools may resort to such restrictions does not advance our inquiry here or allow us to conclude that the facts alleged in the Complaint are sufficient to give rise to a special relationship or a state created danger.
In arguing that we should find a special relationship here, Judge Fuentes cites to Judge Becker’s statement in dissent in Middle Bucks that “a special relationship [between a public school and its students] may exist under certain narrow circumstances.” Fuentes Dissent 188. We do not disagree. In holding that public schools do not generally have a constitutional duty to protect students from private actors and that the allegations here are not sufficient to establish a special relationship, we do not foreclose the possibility of a special relationship arising between a ‘particular school and particular students under certain unique and narrow circumstances. However, any such circumstances must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school’s traditional in loco parentis authority or compulsory attendance laws.
The circumstances that our dissenting colleagues rely upon to insist that a special relationship exists under the facts alleged here are not “certain narrow” circumstances at all. Instead, they are endemic in the relationship between public schools and their students. The dissent would hold that a special relationship exists such that “Blackhawk undertook a limited obligation to keep the Morrows safe ... because Blackhawk compelled school attendance, exercised extensive control over not only the student victims but also the specific threat at issue in the case — a violent bully subject to two restraining orders— and enforced school policies that prevented the Morrows from being fully able to protect themselves.” Fuentes Dissent 188. However, those factors do not distinguish the circumstances here from those that arise in the general relationship between public schools and their students.
As discussed above, we cannot hold that a special relationship arose from compulsory school attendance laws and the concomitant in loco parentis authority and discretion that schools necessarily exercise over students, or the school’s failure to do more to protect Brittany and Emily, without ignoring the analysis in DeShaney, and the “considered dicta” in Vemonia School District. In arguing to the contrary, our dissenting colleagues exaggerate the extent of a school’s control over its students. Judge Fuentes insists that “[t]he State’s authority over children while they are in school extends beyond their well-being and is nearly absolute.” Fuentes Dissent 191 (emphasis added). However, the mere fact that a school can require uniforms, 24 Pa. Stat. Ann. § 13-1317.3, or prescribe certain behavior while students are in school, 22 Pa.Code § 12.2, does not suggest a special relationship at all. Rather, such commonly accepted authority over student conduct is inherent in the nature of the relationship of public schools and their pupils.[13] They do not suggest that a *172 concomitant constitutional duty to protect students necessarily arises from that authority.
Significantly, our dissenting colleagues do not purport to argue that compulsory attendance laws and the school’s authority over students are themselves sufficient to satisfy the limited exception carved out in DeShaney. Thus, the dissent attempts to characterize the specific circumstances of this case as so extraordinary and compelling that a constitutional duty to protect arose under DeShaney. We are not persuaded.
The fact that “the specific threat at issue in this case” was “a violent bully subject to two restraining orders,” Fuentes Dissent 188, does not necessarily give rise to a special relationship. The restraining orders to which the dissent refers were addressed to Anderson, not the Defendants, and the orders themselves do not impose any affirmative duties on the Defendants. Indeed, we very much doubt that any Defendant was a party to the proceedings that resulted in the orders, and no such involvement has been alleged. Although the Defendants, and other third parties, are prohibited from making contact with the Morrow children on Anderson’s behalf, the no-contact orders cannot reasonably be interpreted as imposing any obligation on the Defendants to ensure Anderson’s compliance with the orders or to otherwise enforce them. Cf. Town of Castle Rock v. Gonzales, 545 U.S. 748, 768, 125 S.Ct. 2796, 162 L.Ed.2d 658. (2005) (holding that police department’s failure to enforce restraining order did not constitute a violation of due process under the Fourteenth Amendment).
Moreover, whether our dissenting colleagues are referencing the school’s “No Tolerance Policy,” or the policy that allegedly required Anderson’s expulsion from school, in arguing that the Defendants “enforced school policies that prevented the Morrows from being fully able to protect themselves,” Fuentes Dissent at 188, neither the mere existence of such common disciplinary policies, nor the school’s exercise of discretion in enforcing them, altered the relationship between the school and its students to the extent required to create a constitutional duty under the Supreme Court’s precedent.[14]
The Morrows’ attempt to distinguish their situation based on the Defendants’ “actual knowledge of Anderson’s criminal conduct in this case” is similarly unpersuasive. They argue that such knowledge, combined with “the quasi-custodial relationship that exists in all cases between a public school and its pupils,” created a special relationship for substantive due process purposes.
DeShaney suggests otherwise. Neither our decision in Middle Bucks, nor the dic- *173 turn in Vemonia, necessarily forecloses the possibility of a special relationship arising in an appropriate case. However, the Court has instructed that any such relationship “arises not from the State’s knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.” DeShaney, 489 U.S. at 200, 109 S.Ct. 998. Thus, under DeShaney, the Defendants’ knowledge — of both the no-contact orders and Anderson’s threats and conduct — may be relevant to determining whether the Defendants’ conduct was sufficiently egregious to violate a previously existing duty to protect the Morrow children, but that knowledge cannot create a duty that did not otherwise exist.
To find a special relationship here, our dissenting colleagues rely, in part, on our analysis in the foster care context in Nicini v. Morra, 212 F.3d 798 (3d Cir.2000) (en banc). See Fuentes Dissent 192-93. However, we explained there that “distinctions between children placed in foster care and the prisoners at issue in Estelle or the institutionalized mentally retarded persons at issue in Youngberg are matters of degree rather than of kind. In each of these cases the state, by affirmative act, renders the individual substantially ‘dependent upon the state ... to meet [his or her] basic needs.’ ” Id. at 808 (alteration in original) (citation omitted) (quoting Middle Bucks, 972 F.2d at 1372). By “ ‘finding the children and placing them with state approved families ..., the state assumes an important continuing, if not immediate, responsibility for the child’s wellbeing.’ ” Id. (quoting Middle Bucks, 972 F.2d at 1372).[15]
As we explained in Middle Bucks, unlike children in foster care, students in public schools continue to be primarily dependent on their parents for their care and protection, not on their school. Despite the students’ compulsory attendance in school during the school day and the school’s authority to act in loco parentis during that time, the school’s authority and responsibility neither supplants nor replaces the parent’s ultimate responsibility for the student absent more than is alleged here. Unlike foster care, the restrictions that schools place on students generally, and the specific restrictions alleged here, are different in kind from the restrictions faced by the prisoners at issue in Estelle or the institutionalized persons in Young-berg.
This point is illustrated by the fact that schools generally may not administer medical treatment to students without first obtaining parental consent. See Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ., 166 Pa.Cmwlth. 462, 646 A.2d 689, 691 (1994) (“The principle that parental consent must be secured before [schools may provide] medical treatment ... is time honored and has been recognized by both the courts and the legislature.”). In contrast, when a minor *174 enters foster care, state actors have the authority to bypass parental consent by obtaining a court order authorizing medical treatment. See 55 Pa.Code §§ 8130.91, 3800.19(b); 42 Pa. Cons.Stat. Ann. § 6357 (stating that the custodian, to whom legal custody of a child has been given by the Court of Common Pleas under the Juvenile Act, has “the right to determine the nature of the care and treatment of the child, including ordinary medical care”).[16] When a state agency has custody of a minor child for whom a decree of termination of parental rights has been entered, the agency acquires authority to consent to all medical examination or treatment, including major medical, psychiatric and surgical treatment of the minor even without obtaining a court order. See 23 Pa. Cons. Stat. Ann. § 2521(c).
The dissent’s citation to Smith v. District of Columbia, 413 F.3d 86 (D.C.Cir.2005), is also unavailing. In Smith, the court found a special relationship between the District of Columbia and “an adjudicated delinquent whom the District had, by affirmative exercise of its police power, placed with its agent, [an independent living program], through a court order revocable only by another court order.” Id. at 94. The dissent argues that “[l]ike the children in Smith, the Morrows were technically free to ‘come and go’ from school after certain hours but ‘risk[ed] punishment’ for ‘failing] to obey [the State’s] restrictions on [their] ... freedom’ while in school.” Fuentes Dissent 193 (alterations in original) (quoting Smith, 413 F.3d at 94). However, the fact that the juvenile in Smith enjoyed a degree of freedom of movement while housed at the independent living program is not determinative. The state’s liability arose from the fact that the state, through court order, had removed the juvenile from the care and custody of his parents and required him to live under the care and custody of the independent living program, which was acting as the state’s agent under a very detailed contract between the program and the state.
In DeShaney, the Supreme Court expressly noted that “[h]ad the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.” DeShaney, 489 U.S. at 201 n. 9, 109 S.Ct. 998. That is precisely what happened in Nicini; it is not what happened here. Moreover, the Court acknowledged in DeShaney that “several Courts of Appeals have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes.” Id. Citing this footnote, the court in Smith found that the independent living program there “presents a scenario close to the one described in the DeShaney footnote.” Smith, 413 F.3d at 94.
The dissent contends that this “focus on who remains the victim’s primary caregiver ... contrasts] sharply with our holding in Horton v. Flenory, 889 F.2d 454 (3d *175 Cir.1989).” Fuentes Dissent 189 n.3. We agree that the facts of Horton are instructive, but believe that they clearly counsel against imposing a constitutional duty here.
In Horton, the owner of a nightclub suspected an employee, Powdrill, of burglarizing the club. The owner and another employee began interrogating Powdrill about the burglary. During that interrogation, Powdrill was severely beaten. The owner was a retired veteran of the local police department, 889 F.2d at 456, and the township where the club was located had “[a]n official policy of deferring to private owners with respect to the investigation of crimes in private clubs.” Id. at 458. Nevertheless, the owner did eventually call police. An officer, who had served on the police force with the owner, subsequently arrived, but the officer left Powd-rill alone in the owner’s custody noting that Powdrill was “in good hands” — despite observing blood and evidence of a beating. Id. at 456. After the officer left, Powdrill was beaten again and subsequently died from his injuries. His estate brought an action against the municipality and the responding officer under § 1983. We held that the township could be liable because the jury could have found that the township had “delegated ... its traditional police functions” to the owner of the club. Id. at 458. The responding officer “used his official status to confirm that [the owner] was free to continue the custodial interrogation even though Mr. Powdrill was in fear for his safety and wanted to leave.” Id. Although we framed the precise issue there as whether or not Powdrill “was in state custody at the time of the fatal beating,” id., our inquiry focused on whether the defendant had so limited Powdrill’s ability to act in his own interest as to create the special relationship required for constitutional liability. We explained:
DeShaney requires that the state have imposed some kind of limitation on a victim’s ability to act in his own interests. While specifically referring to imprisonment and institutionalization — the Estelle and Youngberg examples — the court acknowledges that other similar state-imposed restraints of personal liberty trigger a state duty to prevent harm.

Id.

Our finding of a special relationship in Horton also turned on the fact that the abuser there acted pursuant to delegated state authority.
From the evidence the jury could find that New Kensington delegated to [the owner] its traditional police functions .... [A] state can be held responsible for a private action if the private actor has exercised coercive power with significant encouragement, overt or covert, from the state. The function of investigating crimes is clearly a governmental function. An official policy of deferring to private owners with respect to the investigation of crimes in private clubs, which the jury could have found from the evidence, suffices to permit a legal conclusion that [the owner], maintaining custody over Mr. Powdrill, was exercising a delegated state function.
Id. (citations omitted).
The custody that the plaintiff in Horton was subjected to when he was fatally beaten was thus akin to the state’s custody over prisoners. The township had ceded its police authority to detain and interrogate to the club owner. The control a school has over its students does not begin to approximate the restriction of freedom of movement and isolation from possible assistance that existed in Horton or other cases prescribed by DeShaney and its progeny.
*176 Despite our dissenting colleagues’ suggestion that the school’s passivity here amounted to affirmative conduct, there is no assertion that Anderson acted under authority delegated by the school or that she “exercised coercive power with significant encouragement ... from” the school. See id. In fact, Anderson was disciplined for her conduct. Although the school’s response may well have been as inadequate as it was unfair to the Morrow children, the school certainly did not give Anderson or her confederate the authority to harass or bully the Morrow children. We therefore see no conflict between our analysis here and our analysis in Horton.
In reaching this conclusion, we reiterate that we both appreciate the Morrows’ concerns and that we are sympathetic to their plight. Parents in their position should be able to send their children off to school with some level of comfort that those children will be safe from bullies such as Anderson and her confederate. Indeed, the increasing prevalence of the kind of bullying alleged here has generated considerable discussion and legislative action. See T.K. v. New York City Dep’t of Educ., 779 F.Supp.2d 289, 297-98 (E.D.N.Y.2011) (discussing the problem of school bullying in the United States).[17] Nonetheless, “the Constitution does not provide judicial remedies for every social ... ill.” Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Given the limitations of DeShaney, and the language in Vemo-nia, it is now clear that the redress the Morrows seek must come from a source other than the United States Constitution.
Our dissenting colleagues take us to task for expressing concern for the Morrows’ plight without providing a remedy and suggest that the very fact that we are troubled by the result counsels in favor of a constitutional remedy. See Fuentes Dissent at 187 (“The Morrows are today left without a legal remedy for these actions. That future victims may seek relief from State legislatures is of no help to them. We do not adequately discharge our duty to interpret the Constitution by merely describing the facts [of these cases] as ‘tragic’ and invoking state tort law.”) (internal citation and quotation marks omitted) (alteration in original); Ambro Partial Concurrence and Partial Dissent at 185 (“I share Judge Fuentes’ concern that failing to hold a school accountable for violence done to students creates an incentive for school administrators to pursue inaction when they are uniquely situated to prevent harm to their students.”).
However, “the due process clause is not a surrogate for local tort law or state statutory and administrative remedies.” Hasenfus v. LaJeunesse, 175 F.3d 68, 74 (1st Cir.1999). Nor is “[s]ubstantive due process ... a license for judges to supersede the decisions of local officials and elected legislators on such matters.” Id.
Obviously, neither our holding here nor the Supreme Court’s jurisprudence forecloses states from providing public school students and their parents with personally enforceable remedies under state law. We realize that Pennsylvania’s courts have held that school districts are “the beneficiaries of immunity pursuant to the [Political Subdivision Tort Claim] Act” (now codi- *177 fíed at 42 Pa. Cons.Stat. § 8541) and are not subject to “tort liability ... when students are injured in the course of the school day, even if, assuming arguendo, there was negligence on the part of the school officials.” Auerbach v. Council Rock Sch. Dist., 74 Pa.Cmwlth. 507, 459 A.2d 1376, 1378 (1983). However, state legislatures retain the authority to reconsider and change such restrictions in order to better respond to the kind of bullying that happened here and that appears to be all too pervasive in far too many of today’s schools. See T.K. v. New York City Dep’t of Educ., 779 F.Supp.2d at 297-98.
For the reasons we have explained, we cannot fashion a constitutional remedy under the special relationship theory based on the facts alleged in this case.
B. State-Created Danger
The Morrows alternatively argue that the Defendants had a duty to protect Brittany and Emily because they created or exacerbated a dangerous situation. As we explained above, in Kneipp v. Tedder, 95 F.3d at 1201, we first adopted the state-created danger theory as a way to establish a constitutional violation in suits brought under § 1983. We confirmed that liability may attach where the state acts to create or enhance a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process. Kneipp, 95 F.3d at 1205. To prevail on this theory, the Morrows must prove the following four elements:
1) the harm ultimately caused was foreseeable and fairly direct;
2) a state actor acted with a degree of culpability that shocks the conscience;
3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant’s acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state’s actions, as opposed to a member of the public in general; and
4)a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.
Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir.2006) (citations and internal quotation marks omitted).
The Defendants focus on the last prong of the test.[18] They argue that the Morrows have failed to allege any affirmative action by school administrators that made the Morrow children more vulnerable than they would have been had the administrators stood by and done nothing at all. The Morrows argue that the Defendants’ affirmative act was suspending Anderson, and then implicitly inviting her to return to school following the suspension. In other words, the Morrows argue that by permitting Anderson to return to school rather than expelling her, school officials affirmatively used their authority to create a danger that Anderson would attack Brittany and Emily once again. The Morrows also point to the “affirmative act” of allowing Anderson to board the Morrow children’s school bus, where Anderson threatened to attack Brittany.
We have explained that the line between action and inaction is not always easily drawn. “ ‘If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.’ ” Mid *178 dle Bucks, 972 F.2d at 1374 (quoting Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982)). However, the Morrows’ Complaint simply attempts to redefine clearly passive inaction as affirmative acts. Cf. Sanford v. Stiles, 456 F.3d 298, 311-12 (3d Cir.2006) (holding that, where a high school guidance counselor failed to properly evaluate the sincerity of a student’s comment to another student that he wanted to kill himself, she had not committed an affirmative act but rather failed to prevent his death).
We are not persuaded by the Morrows’ argument that the Defendants affirmatively created or enhanced a danger to Brittany and Emily by suspending Anderson and then allowing her to return to school when the suspension ended. Although the suspension was an affirmative act by school officials, we fail to see how the suspension created a new danger for the Morrow children or “rendered [them] more vulnerable to danger than had the state not acted at all.” Bright, 443 F.3d at 281. To the contrary, the suspension likely made the Morrows safer, albeit temporarily. In addition, the fact that Defendants failed to expel Anderson, or, as the Morrows would describe it, “permitted” Anderson to return to school after the suspension ended, does not suggest an affirmative act.
While the Morrows make much of the fact that Defendants’ failure to expel Anderson after she was adjudicated “guilty of a crime” may have been contrary to a school policy mandating expulsion in such circumstances, we decline to hold that a school’s alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here.
The dissent argues that Defendants’ failure to expel Anderson constitutes an affirmative “exercise of authority” that contributed to the danger the Morrows faced, thereby triggering a duty to protect. Under this reasoning, however, every decision by school officials to use or decline to use their authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect. The dissent claims that “state authority necessarily brings with it discretion as to whether or not to take specific actions, and the decision to take one action over another— or to take no action at all — 'is itself an ‘affirmative exercise of authority’ that may carry serious consequences.” Fuentes Dissent 199. Thus, were we to accept the dissent’s formulation here, the state-created danger exception would swallow the rule.[19] Schools would always be liable, under the Dissent’s view, for any injury that could be linked to either action or inaction. Any and all failures to act would be transformed into an affirmative exercise of authority.
The Morrows also rely on the fact that the Defendants permitted Anderson to board Emily and Brittany’s bus despite knowing about the no-contact orders against Anderson, and knowing that that bus did not service Anderson’s home route. However, the only reasonable interpretation of that allegation is that the Defendants failed to take any affirmative steps to ensure that Anderson did not board the Morrow children’s bus.[20] Here again, the *179 Complaint attempts to morph passive inaction into affirmative acts. However, merely restating the Defendants’ inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct.
As Judge Ambro explains, the requirement of an actual affirmative act “is not intended to turn on semantics of act and omission. Instead, the requirement serves ... to distinguish cases where ... officials might have done more ... [from] cases where ... officials created or increased the risk itself.” Ambro Partial Concurrence and Partial Dissent at 186. We therefore hold that the Complaint also fails to state a cause of action under the state-created danger exception.
IV. CONCLUSION
For all the reasons set forth above, we will affirm the District Court’s order granting the Defendants’ Motion to Dismiss.[21]

. See D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364, 1365 (3d Cir.1992) (en banc), wherein Judge Seitz noted that such cases as this present "a classic case of constitutional line drawing in a most excruciating factual context.”

. We will refer to the Blackhawk School District and Assistant Principal Balaski collectively as the "Defendants.”

. Since this is an appeal from the District Court’s grant of the Defendants' Motion to Dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, we must accept the factual allegations contained in the Morrows' Complaint as true. Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir.2011).

. "MySpace” is a popular social-networking website that "allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests.” Doe v. MySpace, Inc., 474 F.Supp.2d 843, 845 (W.D.Tex.2007).

. The Morrows seek: 1) compensatory damages as to all Defendants; 2) punitive damages as to defendant Balaski; and 3) attorneys’ fees.

. Because the District Court dismissed the Complaint with prejudice, it was not necessary for the court to reach the issues of municipal liability and qualified immunity that the Defendants raised in their Motion to Dismiss.

.The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

. "[T]he preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult.” New Jersey v. T.L.O., 469 U.S. 325, 339, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

. In In re McDonald, we explained:
[E]ven if the discussion ... could be accurately characterized as dictum[,] ... we should not idly ignore considered statements the Supreme Court makes in dicta.... Appellate courts that dismiss these expressions in dicta and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.
Id. at 612-13 (citation and internal quotation marks omitted).

.The Court of Appeals for the Second Circuit has not squarely decided this issue. However, district courts in the Second Circuit have generally held that compulsory attendance laws do not create a special relationship between students and school districts resulting in a duty to protect against private actors. See, e.g., Chambers v. N. Rockland. Cent. Sch. Dist., 815 F.Supp.2d 753, 763 n. 10 (S.D.N.Y.2011) ("The consensus among the courts is that the 'special relationship’ doctrine does not apply to the school setting.”).

. Fuentes Dissent 195-96 (citing Maurice Chammah and Nick Swartsell, Student IDs That Track the Students, N.Y. Times, Oct. 6, 2012, http://nyti.ms/ThvbFq).

. Id. (citing J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 915 (3d Cir.2011)).

. Moreover, the generic responsibilities and authority prescribed by state law are not nearly as compelling and authoritarian as our dissenting colleagues suggest. For example, Judge Fuentes cites 22 Pa.Code § 12.2 in arguing that state law requires that students "engage in conscientious effort in classroom work and homework.” Fuentes Dissent 191. However, it is doubtful that parents or students really fear that the awesome authority or weight of the state will come crashing down upon students who do not hand in *172 homework or conscientiously participate in class. It is also not at all clear how the state's authority to require such "conscientious effort" restricts parents’ ability to protect their children, or the students’ ability to protect themselves, while in school.

. Indeed, Judge Fuentes’s suggestion that the school's "No Tolerance Policy" limited “the Morrows' ability to protect themselves,” Fuentes Dissent 193, is both unavailing and troubling. The manner in which the school interpreted and enforced the policy here is certainly open to question as it appears Brittany was suspended for resisting Anderson’s attack. However, that does not begin to approach the kind of restriction on freedom required to give rise to a special relationship under DeShaney. Were we to accept Judge Fuentes’s proposition, school policies prohibiting the carrying of weapons or even cellular telephones at school could theoretically also give rise to a constitutional duty to protect because such policies can also be interpreted as limiting students’ ability to protect themselves.

. The foster care cases from other circuits cited by Judge Fuentes also turn on the fact that the state had displaced the parents' role as primary caregiver and transferred such responsibility to the foster family, an agent of the state. See e.g., Norfleet v. Ark. Dep’t of Human Servs., 989 F.2d 289, 293 (8th Cir.1993) ("In this case, a special custodial relationship ... was created by the state when it took Taureen from his caregiver and placed him in foster care.... In foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs. It cannot be seriously doubted that the state assumed an obligation to provide medical care."); Yvonne L. v. N.M. Dep’t of Human Servs., 959 F.2d 883, 893 (10th Cir.1992) ("[I]f the persons responsible place children in a foster home or institution they know or suspect to be dangerous to the children[,] they incur liability if the harm occurs.”).

. See also Lordes' M. Rosado, Consent to Treatment and Confidentiality Provisions Affecting Minors in Pennsylvania, Juvenile Law Center, Jan. 2006, at 13, available at http:// www.jlc.org/resources/publications/consent-treatment-and-confidentiality-provisions-affecting-minors-pennsylvani ("As a matter of practice, upon accepting a new child for services, private [foster care] agencies have the child's parent/guardian sign a general release authorizing the agency to obtain routine medical examination and treatment for the child. The private agencies in turn authorize the foster parent to obtain [such treatment] for the children.”).

. See also Jackie Calmes, Obamas Focus on Antibullying Efforts, N.Y. Times, Mar. 10, 2011, available at http://www.nytimes.com/ 2011/03/11/us/politics/l lobama.html. In light of the growing problem of school bullying, 49 states, including Pennsylvania, see 24 Pa. Stat. § 13-1303.1-A, have now passed anti-bullying laws. U.S. Dep't of Health & Human Servs., Policies & Laws, www. stopbullying.gov/laws/index.html (last visited Jan. 7, 2013).

. The Defendants claim that the Morrows cannot prove the first three prongs of the test either, but their primary focus is on prong four.

. Judge Ambro also makes a very forceful point in expressing a concern that "creating a constitutional tort out of a school’s failure to expel a student creates a too-easy incentive for schools to expel quickly students who engage in any violent behavior in order to avoid liability or the threat of suit.” Ambro Partial Concurrence and Partial Dissent 186.

. For example, school authorities could have alerted the appropriate bus drivers of the no-contact orders against Anderson and given drivers a photograph of Anderson so they *179 could identify her and prevent her from boarding the wrong bus.

. Because the Morrows cannot make out a claim under either the special relationship or state-created danger theories of constitutional liability, we need not address whether defendant Balaski should be afforded qualified immunity or whether the School District may be held liable as a municipal defendant.